**In re Clayton Theo PERKINS, Debtor.**

**The William W. Barney, M.D. P.C. Retirement Fund, Plaintiff,**

**v.**

**Clayton Theo Perkins, Defendant.**

Bankruptcy No. 02–23007.
Adversary No. 02–2163.

United States Bankruptcy Court, D. Utah.

Sept. 16, 2003.

---

**11.** *In re Williams,* 2000 WL 637313, 85 A.F.T.R.2d (RIA) 1491 (Bankr.W.D.Pa.2000).

John T. Anderson, Anderson & Karrenberg, Salt Lake City, UT, for The William W. Barney, M.D. P.C. Retirement Fund.

Bret A. Gardner, Blackburn & Stoll, Salt Lake City, UT, for Clayton Theo Perkins.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JUDITH A. BOULDEN, Bankruptcy Judge.

This matter is under advisement after trial of creditor William W. Barney, M.D.P.C. Retirement Fund's (the Fund) complaint seeking to declare as nondischargeable a debt owed by the Debtor, Clayton Theo Perkins, to the Fund, pursuant to 11 U.S.C. § 523(a)(2)(A).[1] The Fund claims the Debtor incurred a debt to the Fund by soliciting, receiving and refusing to account for the Fund's assets through false representations and material omissions. The Debtor acknowledges that he owes a debt to the Fund but denies any fraudulent activity and claims the debt is dischargeable.

The matter was tried and thereafter taken under advisement. At the close of the Fund's case, the Debtor moved for dismissal under Fed. R. Bankr.P. 7052(c). The Court took that motion under advisement as well. The Court has now reviewed the evidence, judged the credibility of the witnesses, and has made an independent review of applicable case law. Now, being fully informed, the Court here-

---

1. Future references are to Title 11 of the United States Code unless otherwise noted.

by makes and enters the following findings of fact and conclusions of law.[2]

## FINDINGS OF FACT

1. *The Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 157(a), (b)(1), (b)(2)(I) (core proceeding), § 1334(b) and 11 U.S.C. § 523(c).[3]

2. *The Debtor filed a petition for relief in this Court under Chapter 7 on February 26, 2002.

3. *The Debtor's schedules list the Fund as the holder of an undisputed, non-contingent liquidated claim in the amount of $900,000.

4. The Fund is a creditor of the Debtor.

5. On February 22, 2002, the Third Judicial District Court of Salt Lake County, Utah entered an Amended Default Judgment in favor of the Fund and against the Debtor in the principal amount of $889,060.84 (the Debt).

6. The Fund timely filed an adversary complaint to have the Debt declared non-dischargeable under §§ 523(a)(2)(A) and 523(a)(4)[4] of the Bankruptcy Code.

### The Fund's Entrustment of Assets with the Debtor

7. *The Fund is, and since 1983 has been, an IRS-qualified pension plan established and administered for the benefit of the employees of William W. Barney, M.D. P.C. (Dr. Barney), a Utah professional corporation.

8. *Dr. Barney has served as the Fund's managing trustee and administrator since 1981.

9. *In 1981, the Fund began entrusting its assets with an entity known as Aspen Business Company, in which the Debtor (who was a licensed CPA) and his then-partner, Richard Beckstrand, were the two major principals.

10. Dr. Barney first met with the Debtor while Dr. Barney was working with Mr. Beckstrand.

11. The Debtor continued to work with Mr. Beckstrand at Aspen Business Company until approximately 1991.

12. *In 1991 or 1992, the Debtor relinquished his interest in Aspen Business Company and became the sole owner of, and an officer and director in, a Nevada corporation known as Investco Financial Services (Investco). At that point, the Debtor, through Investco, assumed responsibility for investment of the Fund's assets (all of which were received before the end of 1992) through loans (collectively Loans) to third parties.

13. Investco would provide its clients, including the Fund, with the opportunity to participate in certain investments by depositing funds with Investco, which funds Investco would then use to help fund a loan to a third party.

14. After depositing funds with Investco, Investco's clients, including the Fund, received an agreed upon fixed rate of return on its percentage of the funds placed with Investco and used for a particular third party loan.

15. *Many of the loans were evidenced by promissory notes collateralized by trust deed liens against real property.

16. Upon separation from Aspen Business Company, Investco acquired the right

---

**2.** Findings of fact and conclusions of law are made pursuant to Fed. R. Bankr.P. 7052.

**3.** Findings of fact designated with an asterisk are stipulated facts, with stylistic modifica-

tions, contained in the Pretrial Order entered on July 1, 2003.

**4.** The § 523(a)(4) claim was dismissed by this Court on summary judgment on May 9, 2003.

to collect on loans of approximately $2.4 million and carried over an equal amount of obligations to investors.

17. With Dr. Barney's consent, the Fund's accounts were transferred from Aspen Business Company to Investco.

18. Investco used these transferred funds to place the Loans to third parties with the Fund's consent.

19. Dr. Barney's consent came after reassurance from the Debtor that he would continue to receive account statements and the Loans in which the Fund was invested would be fully secured.

20. While Investco took over all of the Fund's accounts, only a portion of Loans originally funded by the Fund were transferred from Aspen Business Company to Investco.

### The Debtor's Preparation of Account Statements to Reflect the Value of the Fund's Assets.

21. *From 1992 until early 2001, the Debtor was responsible for maintaining records regarding the receipt, deployment and disbursement of the Fund's assets.

22. Debtor's principal assistant in this task was Thora Christensen.

23. *The Debtor caused written account statements (collectively Account Statements) to be sent to the Fund at least annually, and was responsible for assuring that the Statements were accurate and that they fully and fairly reflected the value of the Fund's assets.

24. *The Fund received Account Statements from the Debtor between 1992 and June 2000.

25. The Account Statements reflected the balance owing to the Fund as of the date on the statement.

26. Dr. Barney would review these Account Statements when they arrived every six months. He also passed a copy of the Account Statement along to his accountant.

27. After receiving the Account Statements, Dr. Barney would contact Ms. Christensen to arrange a meeting with the Debtor. At these meetings Dr. Barney always asked the Debtor if he was having any trouble with collections on the Loans and was reassured by the Debtor that Investco was bringing in money from collection of the Loans.

28. The Debtor's representation that Investco was bringing in money from the collection of the Loans was a misrepresentation, because it gave Dr. Barney the false impression that all of the Loans were being collected by Investco in a timely manner.

### Investco Financial Problems

29. Beginning in approximately 1993, Investco began to experience financial difficulties because multiple business entities or individuals unexpectedly defaulted on loans made by Aspen Business Company or Investco to third parties.

30. A number of loans made by Investco to third parties became uncollectible due to law suits, foreclosures and settlements of threatened law suits. These multiple loan defaults caused Investco to sustain substantial monetary losses.

31. While the Debtor testified he maintained records as to which debts became uncollectible, he was not able to locate them.

32. Investco's inability to collect on these loans to third parties made it progressively more difficult for the Debtor to re-pay to the Fund the interest that had accrued on funds previously placed with Investco.

33. Between 1996 and 2001, the Debtor deposited his own money and family money into Investco to bolster Investco and

help cover the financial losses that had been sustained from uncollectible third party loans.

34. While the Debtor admitted the uncollectibility of these loans was "a very important fact" he never disclosed these problems to the Fund or to Dr. Barney.

### The Loan to WTS

35. *One of the Loans that the Debtor made was to a Wyoming trucking corporation known as WTS, Inc. (WTS) in the principal amount of $579,000 (WTS Loan).[5] About $70,000 to $79,000 of the WTS Loan was oral and undocumented.

36. WTS was established in 1995 and was a newly organized corporation at the time the WTS Loan was made.

37. One of WTS's officers and directors, Larry Pritchard, is a long-time friend of the Debtor.

38. WTS did not own any real estate. Many of the loans WTS obtained were personally guaranteed by its officers and directors. The WTS Loan was evidenced by a Loan Agreement dated October 1, 1996 in the amount of $500,000, and by a promissory note dated October 1, 1996 in the principal amount of $500,000 with an interest rate of 12% per annum.

39. Because WTS owned no real estate, the WTS Loan was collateralized by a security interest in WTS's accounts receivable as evidenced by a Form UCC–1. The UCC–1 was signed by Mr. Pritchard on behalf of WTS and the Debtor on behalf of Investco. However, the Debtor never perfected this security interest and never collected any of the WTS accounts for the purpose of recovering on the WTS Loan.[6]

### Debtor's Relationship With WTS

40. *At the time the Debtor made the WTS Loan, the Debtor owned a one-third interest in WTS and had guaranteed many of WTS's debts in the hope of eventually deriving income from the business. WTS and one of its affiliates were the principal source of the Debtor's income in the two years preceding the filing of his bankruptcy petition.

41. The Debtor's personal guarantee of WTS debts exceeded $500,000 at the time of the WTS Loan.

42. In 1997 and 1998, the Debtor received compensation from WTS in the amount of approximately $36,000 per year. From 1995 to 2000, WTS also paid the salary of Ms. Christensen, who, among other things, assisted the Debtor in the preparation of the Account Statements that were provided to the Fund.

43. WTS's outside accountant between 1995 and 2000 was Joseph Glass, CPA, the same accountant whom the Debtor and Investco used during that period of time.

44. At the time the WTS Loan was made, the Debtor's company, Investco, had an informal pre-existing factoring arrangement with WTS.

45. *The Debtor disclosed to the Fund that at least $500,000 was being loaned by the Debtor to WTS. However, the Debtor did not inform the Fund of his financial interest in WTS at the time he made the

---

**5.** The parties dispute the source of the money used to fund the WTS Loan. It is the Fund's position that it was the Fund's money. It is the Debtor's position that $500,000 of the WTS Loan came from the Debtor, and that all, a portion, or none of the $79,000 principal balance could have been provided by the Fund.

**6.** The Debtor testified that he collected close to "hundreds of thousands" of dollars in accounts receivables in 2000 but the funds did not go to repay Investco or the Fund. Instead, the money was applied to other debts Mr. Pritchard and the Debtor had personally guaranteed and to operating expenses of WTS.

WTS Loan. He first disclosed this fact at his Rule 2004 Examination in May 2002.

46. The Debtor also failed to inform the Fund at the time of the WTS Loan of his personal guarantees of WTS's debt, of his personal friendship with Mr. Pritchard, and of Investco's then-existing arrangement for the factoring of WTS's accounts receivable.

47. In testimony, the Debtor acknowledged that these were important and material facts but failed to adequately explain why they were not disclosed to the Fund.

48. The Debtor also testified that he did not disclose his personal involvement as a conflict to the Fund but did admit he realized there was a conflict in 1998 or 1999 when WTS started having financial problems.

49. The Debtor was acting in his own self-interest when he entered into the WTS Loan on behalf of Investco.

50. The Debtor's failure to disclose to the Fund his multiple relationships to WTS was a material omission.

### The Fund's Reliance

51. Although Dr. Barney is the trustee and administrator of the Fund, he was not trained in the management of financial assets. For this reason, Dr. Barney chose to accept investment advice regarding the Fund's assets from someone he felt was trustworthy.

52. Dr. Barney originally placed this trust in Mr. Beckstrand of Aspen Business Company where he first became acquainted with the Debtor.

53. When the Debtor broke away from Mr. Beckstrand and Aspen Business Company to run Investco, Dr. Barney agreed to allow the Fund to follow the Debtor to Investco.

54. Dr. Barney discussed his investment objectives for the Fund with the Debtor and placed his trust in the Debtor to assist him in managing Fund assets.

55. Dr. Barney trusted the Debtor's management of the Fund's investments and relied upon the Account Statements issued by Investco in determining the value of its investments.

56. Dr. Barney also relied upon the Debtor's oral representations that the Loans were being collected and that the Loans would be fully secured.

57. Dr. Barney's reliance on the Account Statements and upon the oral representations was justifiable.

### The Fund Connection to WTS Loan

58. The Debtor told Dr. Barney about the WTS Loan after it was made and asked for approval or consent to use Fund money to fund the WTS Loan.

59. The Debtor explained that the WTS Loan would be secured by WTS's accounts receivable.

60. *The WTS Loan first appears on the Account Statement for the period ending December 31, 1996, and is coded as Account No. 1220.[7]

61. Dr. Barney authorized Investco to transfer money from approximately twenty-five other Loan accounts into Account No. 1220 to receive a higher interest rate on or about October 1, 1996 as reflected in the December 31, 1996 Account Statement.

62. The higher interest rate generated by Account No. 1220 is listed as 12% on the Account Statements. This is the same interest rate as the WTS Loan.

---

7. While this is one of the stipulated facts as set forth in the pre-trial order, Debtor's counsel objected to any reference to it at trial and maintained throughout the trial that Account No. 1220 is not related to the WTS Loan.

63. *The amounts listed for Account No. 1220 are $224,062.99 on the December 31, 1996 Account Statement; $323,610.93 on the June 30, 1997 Account Statement; $465,456.96 on the June 30, 1998 Account Statement; $537,355.17 on the June 30, 1999 Account Statement; and $579,089.64 on the June 30, 2000 Account Statement.

64. The June 30, 1998 Account No. 1220 Account Statement reflects a withdrawal of $50,000 by the Fund on February 9, 1998. WTS made a payment of $55,000 to Investco on February 9, 1998.

65. The June 30, 1999 Account Statement for Account No. 1220 reflects several withdrawals of $5,000. At least two or three of these withdrawals were funded by WTS loan payments made on similar dates.

66. While the Debtor disputes whether or not Fund money was used to fund the WTS Loan, the Court finds that WTS Loan repayments were used to pay the Fund withdrawals.

67. Based on the above findings, the Court finds that Account No. 1220 is an accounting of the WTS Loan and that Fund money was used in the transaction between WTS and Investco.

### Other WTS Loans

68. An additional loan of Three Hundred Thousand dollars ($300,000) was made by the Debtor to WTS through a loan made by Wasatch Equipment Company to Donald J. Horton. Mr. Horton co-owned a piece of real property with the Debtor in Heber, Utah.

69. Mr. Horton then loaned $300,000 to WTS.

70. The Debtor then executed a promissory note for $300,000 in favor of Mr. Horton, and agreed to repay to Mr. Horton the money which Mr. Horton had loaned to WTS. The $300,000 loan was secured by the Heber, Utah real property co-owned by the Debtor and Mr. Horton.

71. The Debtor also loaned $200,000 of his own or family money directly to WTS. This money was comprised of the Debtor's own money or money which the Debtor's spouse paid to WTS.

72. Both the Horton loan and the $200,000 from the Debtor were in addition to the $500,000 WTS Note.

73. The Debtor presented evidence of the Horton loan and the Debtor's $200,000 loan to refute the Fund's assertion that the Fund's money was used to fund the WTS Loan. However, the Court finds, based upon all the evidence, that the Fund's money was used to fund the WTS Loan.

### Like Every Other Loan, the WTS Loan is Completely Uncollectible

74. *Until his Rule 2004 Examination in May 2002, the Debtor never disclosed that any of the Loans were uncollectible, even though they had begun to be uncollectible as early as 1993. The Debtor failed to do so even though he knew this disclosure was a "very important fact."

75. By 2000, WTS was struggling financially. Nevertheless, between April and November 2000, the Debtor loaned $405,000 to WTS.

76. *WTS has never repaid the $579,000 to Investco or Debtor or to any family member of Debtor despite repeated demands from Debtor that the Loan be repaid.

77. WTS made only three loan payments to Investco totaling $80,000 between November 1997 and May 1999.

78. *In his Account Statement dated June 30, 2000, the Debtor reported that the value of the Fund's assets was more than $954,000.

79. *The Debtor stopped providing Account Statements after June 30, 2000 be-

cause Investco ceased its business at about that time.

80. \*All of the Loans are now completely uncollectible and the value of the Fund's assets is zero.

81. In 2000, the Debtor transferred to WTS's president, Mr. Pritchard, the Debtor's one-third share ownership in WTS in exchange for WTS's best efforts to get the Debtor released from the numerous personal guarantees that he had provided to WTS.

82. \*Between 1995 and 2001, the Fund withdrew from Investco approximately $460,000 to $510,000 in assets previously placed by the Fund with Aspen Business Company.

From the foregoing Findings of Fact, the Court makes the following

## CONCLUSIONS OF LAW

### A. *Jurisdiction and Standard of Proof*

This Court has jurisdiction over the parties and subject matter of this complaint. The matter is core pursuant to 28 U.S.C. § 157(b)(2)(I) and the Court may enter a final order.

■ Discharge provisions will be strictly construed against the creditor and liberally construed in favor of the debtor.[8] The standard of proof for a nondischarge-

ability action under § 523(a)(2)(A) is the preponderance of the evidence standard.[9]

### B. *Section 523(a)(2)(A).*

■ If a debtor obtains money, property, or an extension or renewal of credit by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition"[10] the debt is nondischargeable under § 523(a)(2)(A). To prevail on a § 523(a)(2)(A) claim, a creditor is required to prove by a preponderance of the evidence (1) a fraudulent misrepresentation or omission, (2) that induces another to act or refrain from acting, (3) causing harm to the creditor, and (4) the creditor's justifiable reliance on the misrepresentation.[11]

### 1. **Material Omission.**

■ The Supreme Court has issued guidance and instruction in interpreting the terms of § 523(a)(2)(A). The terms "false pretenses," "false representation," and "actual fraud" are given the definitions developed under common law. In *Field v. Mans*, the Supreme Court explained "we will look to the concept ... as it was understood in 1978 when that language was added to § 523(a)(2)(A)."[12] Therefore, in interpreting the language of § 523(a)(2)(A), this Court must be guided by the Restatement of Torts.

---

8. *See Bellco First Fed. Cr. Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

9. *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (holding that preponderance of the evidence standard, rather than clear and convincing standard, applies to all exceptions to discharge); *see also Nelson v. Tsamasfyros (In re Tsamasfyros)*, 940 F.2d 605, 607 (10th Cir.1991) (stating that the preponderance of the evidence standard applies to all exceptions to the dischargeability of debts set forth in § 523).

10. 11 U.S.C. § 523(a)(2)(A).

11. *See Lang v. Lang (In re Lang)*, 293 B.R. 501, 514 (10th Cir. BAP 2003), *see also Skull Valley Band of Goshute Indians v. Chivers (In re Chivers)*, 275 B.R. 606, 619 (Bankr.D.Utah 2002).

12. *Field v. Mans*, 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

▇▇▇ A false pretense as used in § 523(a)(2)(A) includes material omissions, and means "implied misrepresentations or conduct intended to create and foster a false impression."[13] An overt misrepresentation is not required, because "omissions or a failure to disclose on the part of the debtor can constitute misrepresentations for purposes of nondischargeability where the circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor."[14] The applicable restatement where nondischargeability is sought for a material omission is § 551 which addresses liability for nondisclosure:

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or *other similar relation of trust and confidence* between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

. . . .

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.[15]

The relationship the Fund relies upon in applying § 551 of the Restatement is one of "trust and confidence." Comment f of the Restatement lists several relationships that fall into this category of "trust and confidence" including "a bank and an investing depositor."[16] At the very least, the relationship between the Debtor and the Fund is analogous to one of bank and investing depositor requiring a duty of reasonable care in disclosure.[17]

▇▇▇ The Fund also argues that an agency relationship is one of trust and confidence. An agency relationship requires that "unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency."[18] An agent's duties undoubtedly extend to refraining from self-dealing transactions which have the potential to benefit

---

13. *Peterson v. Bozzano (In re Bozzano)*, 173 B.R. 990, 993 (Bankr.M.D.N.C.1994) (abrogated on other grounds). *see also Cooke v. Howarter (In re Howarter)*, 95 B.R. 180, 187 (Bankr.S.D.Cal.1989) (explaining "[i]n appropriate circumstances, material omissions can constitute false representations.... This case presents such circumstances.").

14. *In re Bozzano*, 173 B.R. at 993.

15. Restatement (Second) of Torts § 551(2) (1976) (emphasis added).

16. *Id.* at cmt. f.

17. Earlier this year, this Court issued an opinion upon the parties' cross-motions for sum-

mary judgment on the issue of whether the Debtor was acting as a fiduciary as the term is defined in § 523(a)(4). The Court held that the Debtor is not a fiduciary of a statutory trust as set forth in the Employee Retirement Income Security Act for the purposes of § 523(a)(4), but this determination does not effect the analysis determining whether or not the Debtor held a relation of trust and confidence *similar* to that of a fiduciary under the Restatement.

18. Restatement (Second) of Agency § 387 (1968).

the agent at the expense of the principal.[19] Such self-dealing takes advantage of the trust and confidence placed in the agent by the principal.

▪ It is unnecessary to determine whether or not the Debtor was in fact the Fund's agent because the Court finds that the Fund developed a relation of trust and confidence with the Debtor through their years of doing business together. The Debtor's position as an investment manager for the Fund's assets created a relationship of trust and confidence similar to an agency relationship. This relationship triggered a "duty to exercise reasonable care to disclose" as explained in § 551 of the Restatement. The relationship also placed an obligation on the Debtor to exercise the utmost good faith, loyalty, and honesty toward the Fund, to act solely for the benefit of the Fund in all matters connected with the relationship, and to refrain from any self-dealing transactions which had the potential to benefit the Debtor at the expense of the Fund. The Debtor has failed to uphold this duty by his failure to disclose a significant amount of information material to the Fund's investments.

The Debtor failed to disclose that as early as 1993 many of the loans listed on the Fund's Account Statements had begun to be uncollectible. The Debtor gave oral reassurance to Dr. Barney that Investco was still collecting on the existing loans in their bi-annual review of the Account Statements. The fact that the security interest in account receivable was not perfected was not disclosed by the Debtor to Dr. Barney. From 1993 to 2000 the Debtor continued to produce Account Statements to the Fund reflecting accrual of interest in accounts that were in fact not appreciating in any way but were actually declining in value as evidenced by the non-existence of the funds reflected in the final balance on the June 30, 2000 Account Statement of $954,061.84. Debtor admitted the uncollectibility of accounts was material and "very important" and yet he still failed to disclose this information to the Fund.

While the Debtor vigorously asserted that Account No. 1220 reflected in the Fund's Account Statements is not related to the WTS Loan, this Court finds that the surrounding facts and circumstances (including an admission in the pre-trial order that is now contested by the Debtor) create a convincing inference that Fund money was used to fund the WTS Loan from Investco. The Fund was unable to produce documents that directly linked money leaving the Fund bound for WTS because the Debtor claims neither Investco nor WTS has records of the source and timing of the loans. Considering the fact that the Debtor is an accountant, the lack of documents maintained by either entity surrounding these transactions is astounding. The Debtor insists he collected accounts receivables during WTS's decline, however, none of the "hundreds of thousands" of dollars collected by the Debtor during 2000 was used to repay Investco or the Fund. The Debtor's failure to maintain and preserve contemporaneous records regarding the loan amounts disbursed to WTS and the interest accruing on the WTS Loan does not protect him from liability for failing to disclose material information to the Fund, and does not rebut the compelling evidence that Fund money funded a portion of the WTS Loan.

The Debtor testified that he asked for Dr. Barney's approval or consent to use Fund money to fund the WTS Loan. At that time, the Debtor may have informed Dr. Barney that WTS was an existing

---

19. *Wheeler By and Through Wheeler v. Mann,* 763 P.2d 758, 760 (Utah 1988).

client of Investco and that the WTS Loan was secured by WTS's accounts receivable. However, the Debtor failed to disclose his personal conflicts. The Debtor did not inform the Fund that he owned a one-third share of WTS. The Debtor did not inform the Fund that he was a personal friend of Mr. Pritchard, the president of WTS and signatory to the WTS Loan. The Debtor did not inform the Fund that he was an officer and director of WTS and as such was personally liable as guarantor on much of WTS's debt. The Debtor did not explain to the Fund that he personally invested in WTS. The Debtor did not inform the Fund that he drew a salary from WTS. The Debtor failed to inform the Fund that his assistant, Ms. Christensen, who assisted the Debtor in the preparation of the Account Statements provided to the Fund, was receiving a salary from WTS. The Debtor did not inform the Fund that between 1995 and 2000 WTS, the Debtor and Investco all used the same accountant, Joseph Glass. Finally, the Debtor did not inform the Fund that the security interest in WTS's accounts receivable was unperfected and that the accounts receivable were already factored. The Debtor admits that these are important and material facts. While the Debtor did not view these facts as creating a conflict of interest at the outset, he later realized the potential conflict in 1998 or 1999 when WTS encountered financial problems, but continued to conceal the relationship from the Fund.

The evidence points toward the conclusion that the Debtor was in a position of trust and confidence as used in the Restatement. A position the Debtor abused by omitting material information relevant to the Fund's investments.

### 2. Inducement.

The second element required under § 523(a)(2)(A) is that the debtor made a misrepresentation to obtain money, property or services, or to induce the creditor into extending credit. Section 531 of the Restatement provides:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.[20]

The Debtor has attempted to refocus the Court's attention on a fraudulent inducement at the time Investco originally received investment moneys from the Fund, relying on the language from § 523(a)(2) explaining money, property or credit "obtained by" fraud is exempt from discharge. However, the Debtor misses the point. It is not acceptable for a debtor to obtain funds legitimately and later deceive the creditor in the continued use of the funds, and then be absolved of his fraud simply because he obtain the funds legitimately. " 'Fraud' may include fraud in the inducement and actual fraud in the transaction."[21] One court has explained, "Webster's Third New International Dictionary Unabridged (1986) defines 'obtain' as 'to gain or attain possession or disposal of usually by some planned action or method.' "[22] The Debtor gained possession of

---

**20.** RESTATEMENT (SECOND) OF TORTS § 531 (1976).

**21.** *McCoun v. Rea (In re Rea),* 245 B.R. 77, 85 (Bankr.N.D.Tex.2000).

**22.** *Id.* at 87.

the Fund's money after Investco was formed and the Debtor carried the Fund's accounts over from Aspen Business Company. The Debtor then had the daily use of the Fund's money to invest in third party loans with the Fund's consent. Each time the Fund agreed to be involved and allowed its assets to be used to fund a particular loan, the Debtor "obtained" funds. The Debtor testified that he asked for approval or consent from Dr. Barney to use Fund money for the WTS Loan. By omitting material facts as discussed above, the Debtor fraudulently obtained Fund money.

### 3. Harm.

 The harm is clear. The Debtor caused Account Statements to be sent to Dr. Barney reflecting account balances accruing from defunct loans. The WTS Loan was one of the uncollectible loans and was reflected in the Account Statements for Account No. 1220. The account balances do not have any connection to reality—Investco is unable to pay the Fund any of the money reflected in the Account Statements.

The measure of damages for fraudulent misrepresentations, including material omissions, is found in § 549 of the Restatement.[23] This section allows recovery of damages of

(a) the difference between the value of what [the plaintiff] has received in the transaction and its purchase price or other value given for it; and

(b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.[24]

The Fund's claim of $889,060.84 was liquidated to judgment in state court and is listed as an undisputed, non-contingent debt on the Debtor's bankruptcy schedules. This amount represents the loss the Fund sustained as a result of its reliance on the Debtor's representations, and his failure to disclose material information related to the WTS Loan.

### 4. Justifiable Reliance.

The final element under § 523(a)(2)(A) is justifiable reliance.[25] The Fund argues that where the claim is based on a material omission rather than an affirmative misrepresentation, it is not necessary to prove this final element. In making this argument, plaintiff relies on pre-*Field v. Mans* case law from the Ninth Circuit, stating "it is impossible to demonstrate reliance, since to do so requires proof of a speculative set of facts, i.e., how one would have behaved if omitted material information had been disclosed."[26] "In other words, a plaintiff alleging nondisclosure does not have to present positive proof of reliance-the mere withholding of a material fact in the face of a duty to disclose establishes the requisite causation."[27] The Ninth Circuit subsequently analyzed *In re Apte* in light of the Supreme Court's guidance on justifiable reliance but still concluded "justifiable reliance is established when a party with a duty to disclose a material fact fails to do so."[28] Were this Court to adopt this stan-

23. *See* RESTATEMENT (SECOND) OF TORTS § 549 (1976).

24. *Id.* at § 549(1)(a)–(b).

25. *See Field v. Mans,* 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), *see also* RESTATEMENT (SECOND) OF TORTS § 525 (1976).

26. *Rainier Title Co., Inc. v. Demarest (In re Demarest),* 176 B.R. 917, 921 (Bankr. W.D.Wash.1995).

27. *Romesh Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte),* 180 B.R. 223, 229 (9th Cir. BAP 1995).

28. *Tallant v. Kaufman (In re Tallant),* 218 B.R. 58, 68 (9th Cir. BAP 1998).

dard the analysis would end here because it is already established that the Debtor had a duty to disclose material facts to the Fund which he failed to do. Even if this minority viewpoint is not adopted, however, the Fund has proved its case.

 Justifiable reliance does not require the creditor prove he acted consistent with ordinary care and prudence. Instead, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." [29] A creditor is only required to make an investigation beyond the representations given where "under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived." [30]

 Dr. Barney relied on the limited information that was communicated to him by the Debtor in administrating and managing the Fund. Dr. Barney is a medical doctor and is not trained in the management of financial assets. Dr. Barney relied on Investco to keep him informed related to his investment decisions for the Fund. Dr. Barney's reliance on the Debtor for investment information and advice is evidenced by his review of the Account Statements. Dr. Barney would review the Account Statements himself, forward them on to his accountant and then meet personally with the Debtor to assure himself that he was interpreting the statements correctly.

Under these circumstances, Dr. Barney justifiably relied on the materials and information given him regarding the Fund's investments. Dr. Barney relied on the Account Statements issued by the Debtor. He also relied upon the representations that the various loans were being collected, and that all Loans would be fully secured. He does not have an accounting or finance background that would have prompted him to further investigate the representations made to him, and no warning signs were made known to him that should have prompted further inquiry. The material omissions discussed above were so well hidden by the Debtor that Dr. Barney had no suspicion of the lack of information until it was too late and he had already relied on the incomplete information put forward by the Debtor. Dr. Barney, on behalf of the Fund, justifiably relied on the information supplied to him by the Debtor which omitted material information.

## CONCLUSION

Based on the foregoing, the Court finds that the Fund has met all the elements under § 523(a)(2)(A) by a preponderance of the evidence. The Debtor's role as principal of Investco handling investments for the Fund placed him in a position of trust and confidence as used in the Restatement that heightened his duty of disclosure to the Fund. The Debtor made fraudulent misrepresentations to Dr. Barney and omitted a significant amount of information that was material to Dr. Barney's investment decisions on behalf of the Fund. Dr. Barney justifiably relied on the Debtor's representations and omissions in making his investment decisions, and the Fund was harmed as a result. Accordingly:

The Debtor's motion to dismiss is **DENIED.**

**29.** *Field,* 516 U.S. at 70–71, 116 S.Ct. 437 (citing RESTATEMENT (SECOND) OF TORTS § 545A cmt. b (1976)).

**30.** *Id.* at 71, 116 S.Ct. 437 (citing W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971)).

The Debt owed to the Fund's of $889,060.84 is non-dischargeable under § 523(a)(2)(A).

Judgment shall issue accordingly.