In re Gregory Allen DAVISCOURT and Patricia Lynn Daviscourt, Debtors.

Columbia State Bank, N.A., Plaintiff–Appellee–Cross–Appellant,

v.

Gregory Allen Daviscourt and Patricia Lynn Daviscourt, Defendants–Appellants–Cross–Appellees.

BAP Nos. CO–05–126, CO–06–001.
Bankruptcy No. 04–10117–ABC.
Adversary No. 04–1487–ABC.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Nov. 7, 2006.

Bruce E. Rohde of Solomon, Pearl, Blum, Heymann & Stitch LLP, Denver, CO, for Plaintiff–Appellee–Cross–Appellant.

Michael J. Pankow of Brownstein, Hyatt & Farber, P.C., Denver, CO, for Defendants–Appellants–Cross–Appellees.

Before McFEELEY, Chief Judge, THURMAN, and SOMERS[1], Bankruptcy Judges.

THURMAN, Bankruptcy Judge.

Debtors appeal the bankruptcy court's judgment, after trial, finding the entirety of a judgment obtained against them non-dischargeable as against Debtor Gregory Daviscourt ("Greg") and partially non-dischargeable against Debtor Patricia Daviscourt ("Patricia"). Columbia State Bank, N.A. ("Columbia") cross-appeals the bankruptcy court's dismissal of a portion of its claim against Patricia. We affirm the bankruptcy court's judgment in its entirety.

## I. BACKGROUND

The underlying adversary proceeding involves Columbia's relationship with the Debtors' company, Northwest Construction & Restoration ("Northwest"), a corporation formed in 1997 in the State of Washington. Greg and Patricia each owned 50% of Northwest's stock, and Greg was President, while Patricia was Vice President, Secretary, and Treasurer. Northwest specialized in repair of property damage caused by fires, floods, and storms. Its banking relationship with Columbia began in 1999. In order to provide Northwest with working capital, Debtors guaranteed a line of credit ("LOC") from Columbia that increased, during the course of the relationship, from $800,000 to $2,000,000.

Fund availability under the credit line was based on a formula, under which

1. Honorable Dale L. Somers, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Kansas, sitting by designation.

Northwest's "eligible" accounts receivable created a "borrowing base," and upon which Columbia would advance funds. In order to be eligible for inclusion in the borrowing base, accounts receivable could be no older than 120 days post-billing, and could not be subject to a dispute. In addition, there were limits placed on the amount of accounts receivable from a single client, and a "cross-aging" provision that excluded current accounts receivable from clients that also had older, and therefore ineligible, accounts receivable. Under the formula, Columbia would advance funds equivalent to no more than 80% of the borrowing base.

Columbia required a variety of paperwork from Northwest, including both quarterly internal, and annual CPA-reviewed, balance sheets and income statements. In addition, Northwest was required to submit monthly accounts receivable aging reports and certificates of compliance with the borrowing base, jointly referred to as "borrowing base certificates" ("BBCs"). All of the information provided by Northwest to Columbia was created or overseen by Greg.

During the first six months of the banking relationship, the reporting information provided to Columbia by Northwest was facially deficient. Subsequent to that time, although no longer facially deficient, the BBCs still contained inaccurate information and Greg regularly certified materially inaccurate accounts receivable information. On occasion, Kenneth Yokoyama, Columbia's representative, would discuss the BBC irregularities with Greg and was satisfied with his responses. In 2001 and 2002, Columbia's internal loan reviewers warned Yokoyama about the poor quality of Northwest's BBCs. Again, Yokoyama responded by discussing the concerns with Greg and was satisfied with his responses.

Yokoyama passed Greg's reassurances along to the bank's credit decision-makers, who took no further action. However, in late 2001, the Daviscourts responded to the bank's concerns by loaning Northwest $200,000, which was subordinate to the bank's loan.

Greg's misrepresentations regarding Northwest's accounts receivable are pervasive. Greg caused Northwest to engage in the practice of "re-aging," or re-billing, accounts receivable such that accounts that were older than allowed by the borrowing base formula were made to appear newer than they actually were. Certain accounts receivable were included in the borrowing base that had already been collected, had been written off, were disputed, or for which services had not been performed by Northwest.

Northwest's ultimate financial failure relates to a repair job the company undertook on the Julian Apartments in Seatac, Washington in 2001 (the "Julian job"). The Julian Apartments had been substantially damaged by a fire in January 2001, and Northwest was hired to undertake the repairs. In March 2001, while repairing the roof, one of Northwest's subcontractors placed a tarp over some of the lesser-damaged apartments. A storm blew the tarp off of the roof, and the apartments sustained substantial water damage. Thus began an extended period of uncertainty over who would repair, and who would pay for, the water damage. As the bankruptcy court stated, "The size of [the Julian job]; complications that had little to do with Northwest's performance and much to do with being caught between two insurance carriers, each that was looking out for its own interest; and Mr. Daviscourt's handling of reporting on this project to the Bank, combined to put Northwest virtually

out of business."[2] Northwest's misrepresentations relating to the Julian job were in the nature of the previous ones, except that the size of the Julian job made them that much more significant.

In early 2002, Northwest hired Moss Adams, LLP ("Moss"), a regional accounting firm, to prepare its year-end, third party reviewed, financial statements. In the course of those efforts, Moss employees developed concerns about Northwest's internal records, particularly with respect to accounts receivable. Moss made two significant recommendations to Northwest that would have had a substantially negative financial impact on it. First, Moss proposed reducing the reported accounts receivable, other than those on the Julian job, by $677,000. Second, based on the size of the job and lack of backup information, Moss proposed converting the Julian account to a cash basis. Greg testified that he never saw or knew of the Moss proposals, while Moss employees testified that they confronted Greg with the proposals, which he refused to accept. Shortly thereafter, Moss was replaced by Bernston Porter & Company PLLC ("Bernston"). Bernston had been recommended by Yokoyama, whom Greg had told that Moss was conducting its review too slowly.

Bernston was not provided with any of Moss's work or proposals, and was under pressure to provide a quick report. Rather than an audit, Bernston provided a "review," which relied almost exclusively on information provided by management. Bernston neither questioned nor sought independent verification of the financial information Northwest supplied, and did not find anything sufficiently suspicious to require further inquiry. Bernston's final report noted that Northwest was in violation of two loan agreement financial ratio covenants, but the irregularities noticed by Moss were not discovered. In renewing the loan, Columbia waived the financial ratio covenant non-compliance.

A hotly contested issue at trial was whether or not a meeting took place in the winter of 2002 between Greg, his brother Curt Daviscourt ("Curt"), and Yokoyama, at which Greg claimed to have disclosed that the Northwest accounts receivable should be written down by $750,000. As stated by the bankruptcy court, the occurrence of this meeting was "pivotal" to the bank's fraud claim. If the disclosure actually occurred, then Columbia had to have ignored the accounts receivable irregularities when it renewed the loan, and could not claim to have been misled. Significantly, a worksheet in Curt's handwriting that calculated the financial impact to Northwest of such a write-down, was apparently contained in Columbia's files, accompanying an internally prepared 2001 year-end financial summary. Columbia was unable to explain the presence of this document in its files. Noting that the presence of that document in the bank's files "does suggest that the disputed winter 2002 meeting did, in fact, occur," the bankruptcy court nonetheless found that suggestion to be "overcome by the preponderance of other pertinent evidence."[3]

The bankruptcy court first noted discrepancies in the brothers' testimony with respect to the meeting, as well as Curt's failure to produce the notebook diary in which he allegedly kept contemporaneous notes. Further, the court noted that the claimed disclosure would have been "completely out of character" with Greg's approach to both his business and to that specific line of credit, which strongly sug-

---

**2.** *Findings of Fact, Conclusions of Law and Ruling ("Ruling")* at 5–6, *in* Appellants' Appendix ("App.") at 456–57.

**3.** *Id.* at 8, *in* App. at 459.

gested that he was concerned with neither the accuracy nor the detail of the financial information supplied to the bank. The bankruptcy court also found that Greg's testimony that he made the disclosure because it was "the right and honest thing to do," was inconsistent with his failure, shortly thereafter, to discuss these same concerns with Bernston. On the other hand, Yokoyama was "an experienced loan officer who had nothing to gain by trying to hide $750,000 of receivables that should have been written off." [4] Finally, when he and Patricia were subsequently accused by bank representatives of misleading the bank, Greg did not even mention this alleged prior disclosure.

Columbia renewed Northwest's line of credit in July 2002, but changed some of the loan terms. Thus, from that point forward, Northwest was required to deposit all of its accounts receivable in a "lockbox" at the bank, and those proceeds were to be applied to repayment of the loan. Funds would only be re-advanced if either Northwest met the loan conditions or Columbia gave its consent. In addition, the bank engaged in a review of Northwest's collateral in August 2002, which revealed the company's practice of "re-aging" its accounts receivable. By September 2002, Columbia realized that Northwest was substantially over-advanced on its borrowing base. The Daviscourts were asked to attend a meeting with members of the bank's special assets department, at which, they were informed that they were suspected of defrauding the bank and that no additional funds would be advanced without additional collateral.

At approximately the same time, Greg decided to divert accounts receivable collection proceeds from the bank's lockbox without the bank's knowledge or consent. At his request, Patricia opened a checking account at Bank of America in the name of Norcon Construction Company, into which accounts receivable proceeds from Northwest's projects were deposited. Both Daviscourts had signing power on this account, which had deposits of $ 227,757 between when it was opened in September and late October 2002, when it was closed. For several weeks, Greg wrote checks out of this account to pay Northwest's operating expenses, including Patricia's salary.

## II. APPELLATE JURISDICTION

Both the appeal and cross-appeal were timely filed from a final order, and neither party elected District Court review. Therefore, this court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002.

## III. ISSUES AND STANDARD OF REVIEW

The bankruptcy court found that Greg, on behalf of Northwest, made certain "materially false" representations to Columbia that were intended to, and did, mislead Columbia, and upon which Columbia relied. Therefore, the guaranty of Northwest's LOC debt was held non-dischargeable against Greg, pursuant to 11 U.S.C. § 523(a)(2). In addition, the bankruptcy court found that the conversion of accounts receivable payments in late 2002 constituted "willful and malicious injury" to Columbia, and was therefore non-dischargeable against both Debtors, pursuant to 11 U.S.C. § 523(a)(6).

 The Debtors contend that the bankruptcy court erroneously applied the "justifiable" standard of reliance, applicable to § 523(a)(2)(A) claims, to Columbia's § 523(a)(2)(B) claim. Claims made in reliance on § 523(a)(2)(B) require a finding of "reasonable" reliance. We review a bank-

4. *Id.*

ruptcy court's interpretation of a statute de novo.[5] However, the "reasonableness" of Columbia's reliance upon Northwest's misrepresentations is a factual determination which will be reversed only if clearly erroneous.[6]

■ The Debtors also challenge the sufficiency of the evidence supporting the bankruptcy court's findings that: (1) Columbia relied on the misstatements; (2) Greg did not disclose the need for accounts receivable write-downs to Columbia; and (3) that Greg and Patricia acted willfully and maliciously in diverting funds from the lockbox for their own use. Findings of fact are reviewed for clear error.[7]

■ Finally, the Debtors challenge the bankruptcy court's decision allowing Columbia to amend its complaint after the scheduling order amendment deadline had passed. A trial court's decision whether or not to modify a scheduling order is reviewed for abuse of discretion.[8]

■ In its cross-appeal, Columbia asserts that the bankruptcy court should have found Patricia liable on the § 523(a)(2) claim based on an agency relationship between her and Greg. Although the question of whether an agency relationship exists is ordinarily one of fact,[9] which is reviewed for clear error,[10] the question of whether agency principles are even applicable to a § 523(a)(2) claim is an issue of law, which is reviewed de novo.[11]

## IV. DISCUSSION

### A. Amendment of Complaint

The Debtors' attack on Columbia's amendment of its complaint is twofold. First, they assert that Federal Rule of Civil Procedure 16(b) requires a finding of "good cause" for deviating from the amendment deadline set forth in a court's previous scheduling order, and that no such finding was made. Secondly, pursuant to Federal Rule of Civil Procedure 15(c), the Debtors contend that the amendments that were made do not "relate back" to the original complaint, and thus are time-barred.[12]

Columbia's original complaint[13] sought non-dischargeability of the LOC pursuant

5. *Sender v. The Bronze Group, Ltd. (In re Hedged–Invs. Assocs., Inc.)*, 380 F.3d 1292, 1297–98 (10th Cir.2004).

6. *In re Watson*, 958 F.2d 977, 978 (10th Cir. 1992).

7. *Las Vegas Ice & Cold Storage Co. v. Far W. Bank*, 893 F.2d 1182, 1185 (10th Cir.1990).

8. *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978–79 (10th Cir.1996).

9. See, *e.g.*, *Green v. United States*, 434 F.Supp.2d 1116, 1122 (D.Utah 2006).

10. *Las Vegas Ice & Cold Storage Co.*, 893 F.2d at 1185.

11. *Sender v. The Bronze Group, Ltd. (In re Hedged–Invs. Assocs., Inc.)*, 380 F.3d 1292, 1297–98 (10th Cir.2004).

12. Debtors rely on Federal Rule of Bankruptcy Procedure 4007(c) as a limitations period,

citing *Maes v. Herrera (In re Herrera)*, 36 B.R. 693 (Bankr.D.Colo.1984). In fact, *Herrera* neither considered nor discussed Rule 4007, and in any event, is not binding on this Court. Nonetheless, Rule 4007(c) requires that complaints objecting to discharge pursuant to § 523(a)(2) and (a)(6) be filed within 60 days after the first date set for the meeting of creditors. The period may be extended "for cause," after a hearing, if a motion for extension is filed within the limitation period. Columbia complied with this Rule with the timely filing of its original complaint. Thus, Debtors' reliance on this provision is misplaced. Their real argument is that the amendment of the complaint violated the scheduling order without "good cause," as required by Federal Rule of Civil Procedure 16(b).

13. The complaint to which the amendments must relate back is in fact an amended complaint, filed on June 15, 2004, in response to

to § 523(a)(2), based on the BBCs that were submitted to it by Northwest. Following the Debtors' filing of a motion for summary judgment, in which they claimed that Columbia could not show "reasonable reliance" on the BBCs, Columbia was allowed to amend its complaint to expand its § 523(a)(2) fraud claims to include statements about the Julian job, as well as submission of the 2001 year-end documents.

### 1. Amendment after the scheduling order deadline

Rule 16(b) describes what should be included in a trial court's scheduling order, and also provides that the schedule "shall not be modified except upon a showing of good cause." This rule gives trial courts "wide latitude in entering scheduling orders," and modifications to such orders are reviewed for abuse of discretion.[14]

Under the circumstances of this case, the bankruptcy court did not abuse its discretion by allowing the amendment. The Debtors contend that the bankruptcy court simply "ignored its own order" and allowed the amendment without actually finding "good cause." Good cause under this rule "means that scheduling deadlines cannot be met despite a party's diligent efforts."[15]

The scheduling order at issue required that motions to amend pleadings be filed by September 15, 2004, all discovery completed by February 14, 2005, and set trial for two and one-half days, beginning May 16, 2005.[16] Columbia's motion to amend was filed April 7, 2005. The bankruptcy court held a status conference on April 29, 2005, at which the motion to amend was granted, the Debtors' motion for partial summary judgment was denied, and trial was rescheduled to September 26, 2005.

All of the events leading to the filing of Columbia's complaint took place in Washington state, and all witnesses, except the Debtors, resided there. The Debtors resided in Colorado, as did all of the attorneys. As such, conducting discovery was somewhat more difficult than usual. In addition, the claims required deposition and documentary evidence from three different accounting firms, not all of whom were eager to cooperate. Adding to these difficulties was that some accounting firm employees with personal knowledge of the Northwest matters were no longer employed by those firms and had to be located and subpoenaed separately. In fact, discovery was repeatedly extended by stipulation, and was not actually completed until September 2005, the month of trial. The final depositions were at the Debtors' request, and they never sought an additional extension of the trial date.

Columbia's stated reason for its motion to amend was that the amendment would

---

the Debtors' motion to dismiss for failure to plead fraud with particularity.

**14.** *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978–79 (10th Cir.1996). The inquiry does not end if good cause is shown for modification of the scheduling order dates under Rule 16(b), since permission to amend pleadings is governed by Federal Rule of Civil Procedure 15(a). However, that Rule provides that permission to amend should be "freely given," which is a significantly lower standard than the "good cause" required by Rule 16(b). In any event, the Debtors apparently do not ar-

gue that Columbia failed to satisfy the Rule 15(a) standard for amendment, only that the amendment was allowed without "good cause."

**15.** *Dilmar Oil Co., v. Federated Mut. Ins. Co.*, 986 F.Supp. 959, 980 (D.S.C.), *aff'd*, 129 F.3d 116 (4th Cir.1997).

**16.** *Order Pursuant to Scheduling Conference Held September 1, 2004*, at 1–2, *in* App. at 63–64.

make the complaint "conform to the evidence the Bank has gathered during the course of discovery...."[17] The Debtors do not seriously argue that Columbia was not diligent in conducting discovery, nor do they seriously claim to have been surprised or prejudiced by the claims set forth in the amendments. In any event, claims that an amendment was improperly allowed are reviewed for abuse of discretion, which would require this Court to have a "definite and firm conviction" that the bankruptcy court "made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."[18] Applying this standard, we hold that the bankruptcy court did not abuse its discretion by granting the motion to amend.

### 2. Relation Back

Rule 15(c)(2) provides that a pleading amendment "relates back to the date of the original pleading" if the claims in the amended pleading "arose out of the conduct, transaction, or occurrence set forth ... in the original pleading." Thus, the test for relation back is whether "the original pleading gives fair notice of the general fact situation out of which the claim or defense arises...."[19] The Debtors rely heavily on *Herrera* for the proposition that amendments alleging "different statements and conduct" do not relate back.[20] However, we believe that *Herrera* cannot be construed so broadly.

Although not binding on this Court, we consider *Herrera* to be instructive. In that case, plaintiffs originally asserted a cause of action under § 523(a)(6) but sought to amend in order to add a claim under § 523(a)(2). This additional claim was found to properly relate back. Since *Herrera* is a trial court memorandum decision, it does not describe the original and amended allegations in detail. However, it appears that plaintiffs originally alleged that they transferred property to defendant based on his representation to them that he would transfer stock to them in exchange. The amendment also sought to add claims of fraudulent concealment of assets, which the court found did not involve the same transaction or occurrence and, therefore, did not relate back. The *Herrera* court did recognize, however, that the court's focus should be on the notice given to the defendant, and that if the original complaint gives "fair notice of the general fact situation" a more specific amendment will relate back.[21]

Thus, the "bottom line" under Rule 15(c) is the notice given to the opposing party. In this case, the Debtors were at all times aware that Columbia's case was premised upon fraudulent misrepresentation of Northwest's accounts receivable, and that the misrepresented status of the Julian job was particularly troublesome. The precise details of the misrepresentations and omissions could not be learned until extensive discovery was conducted, during which Greg's knowledge, conduct, and manipulation gradually came to light. The Debtors cannot claim to have been surprised by the claims set forth in the amended complaint, which still asserted non-dischargeability under the same statutory provisions and still stated the same general fact situation, *i.e.*, the overstatement and misrepresentation of, and the concealment of information regarding, Northwest's accounts

---

17. *Plaintiff's Motion for Leave to File Second Amended Complaint* at 1, *in* App. at 65.

18. *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir.1994).

19. *Maes v. Herrera (In re Herrera)*, 36 B.R. 693, 694 (Bankr.D.Colo.1984).

20. *Id.* at 695.

21. *Id.* at 694.

receivable. Moreover, the Debtors had ample opportunity to defend themselves against the amended allegations, having learned the facts along with Columbia and having some five months of additional discovery time after the amendment. Therefore, the amendments properly relate back under Rule 15(c).

## B. Renewal of the LOC

### 1. Columbia's claim against Greg

 Columbia's claim against Greg is that he fraudulently induced them to renew the LOC in 2002 and that, therefore, the loan is non-dischargeable in its entirety, pursuant to § 523(a)(2). That statutory exception to discharge provides:

(a) A discharge ... does not discharge an individual debtor from any debt–

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive. . . .

Subsection (A) has been interpreted to require "justifiable" reliance,[22] whereas subsection (B) expressly requires "reasonable" reliance.[23] The Debtors contend that the bankruptcy court's determination that Columbia "justifiably relied" on Northwest's year-end financial statements is insufficient to support non-dischargeability under this statute because, as those documents constitute written statements of Northwest's financial condition, only "reasonable" reliance on those documents is sufficient.[24] Thus, the distinction between subsections (A) and (B) of § 523(a)(2) is significant to this appeal.[25]

The bankruptcy court specifically found that Columbia's evidence "as it relates to the general process of submitting [BBCs] and receivables agings" failed to establish non-dischargeability, even though those documents were "regularly and materially inaccurate," because Columbia failed to show intent to mislead and reliance. In so finding, the court described Greg as "so patently incompetent, careless, or haphazard in providing monthly borrowing base information to the Bank, that his conduct was not consistent with intending to deceive his lender." The court also found that, rather than relying on those documents, Columbia would regularly contact Greg for "assurances that the Bank remained well-secured and not overdrawn on

---

**22.** *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

**23.** "Reasonable" reliance requires a higher standard of care by the relying party than does "justifiable" reliance. *Compare Field v. Mans*, 516 U.S. at 71, 116 S.Ct. 437, *with In re Watson*, 958 F.2d 977, 978 (10th Cir.1992).

**24.** Although Northwest is not a debtor, statements of its financial condition qualify as statements of the financial condition of an

"insider" under § 523(a)(2)(A) and (B). Therefore, reliance on such statements is required to be "reasonable."

**25.** Significantly complicating this issue, neither Columbia nor the bankruptcy court typically specified upon which of these subsections they relied. Instead, the statute was frequently referred to in the bankruptcy court record simply as " § 523(a)(2)."

its borrowing base formula and that Northwest was otherwise complying with its loan agreement." Columbia then verified these assurances with the annual CPA-reviewed financial statements.

Finally, with respect to the Julian job, the bankruptcy court found that Greg gave several assurances to Columbia "that, while there was some jousting going on between insurance companies as to who would ultimately cover which Julian losses, there was no cause for concern" with respect to the Julian accounts receivable. Greg's representations to the bank about that accounts receivable "were substantially and knowingly overstated both in terms of work done and work billed on this project by Northwest," and "in reliance" on those representations, Columbia over-advanced approximately $650,000 against the borrowing base.

Columbia presented evidence at trial showing that it had relied on numerous misrepresentations, including Greg's repeated oral reassurances, the BBCs, and the year-end financials. The bank's expert testified that Columbia's reliance on these representations was "reasonable" under commercial banking practices. The Debtors' expert did not address the reasonableness of the bank's reliance.

■ Columbia suggests that a finding of "reasonable" reliance is implicit in the bankruptcy court's decision. However, the bankruptcy court specifically used the phrase "justifiably relied" in reference to the written statements of financial condition. When considered in light of the parties' agreement that the different standards of "justifiable" and "reasonable" reliance were extensively briefed and argued in the bankruptcy court, such

an implication would be difficult to justify, even assuming this Court has the authority imply such a ruling. In effect, this Court would be rewriting the bankruptcy court's decision. This we decline to do.

■ In any event, such an implication is unnecessary given that there are sufficient oral and written misstatements, particularly with respect to the Julian job, to support non-dischargeability under § 523(a)(2)(A). Intent to deceive under this subsection may be inferred from the totality of the circumstances, and includes reckless disregard of the truth.[26] Moreover, the scienter requirement of subsection (A) may be established by material omissions.[27] Greg made numerous false representations and regularly held back material information regarding the Julian job, which the bankruptcy court found were intended to mislead the bank as to the actual status of that job. Quite simply, Greg was scrambling to keep his company afloat by circumventing the rules the bank had imposed on his LOC. He did this knowingly and with the intent to obtain more funds than he was entitled to under the terms of the LOC. Thus, intent to deceive was established.

The Debtors, however, contend that Columbia neither actually nor justifiably relied on Greg's misstatements. This position is principally based on Greg's alleged disclosure of the need to write-down the borrowing base to Yokoyama at a meeting in early 2002. However, the bankruptcy court found, by a preponderance of the evidence, that the alleged disclosures were not made. In resolving the dispute, the court found both Greg and his brother not

---

26. *Wolf v. McGuire (In re McGuire),* 284 B.R. 481, 492–93 (Bankr.D.Colo.2002).

27. *Wm. W. Barney, M.D. P.C. Ret. Fund v. Perkins (In re Perkins),* 298 B.R. 778, 788 (Bankr.D.Utah 2003).

credible as to the facts they alleged about the meeting.

On appeal, this Court reviews a bankruptcy court's fact findings for clear error, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses.[28] With respect to the "disclosure document," the bankruptcy court found that the document's presence in the bank's files "suggested" that a meeting took place. However, that suggestion was overcome by the weight of contrary evidence. The bankruptcy court's findings and reasoning on this issue are detailed, and do not lead this Court to a "definite and firm conviction that a mistake has been made." [29] As such, the Debtors' continued reliance on the disclosure document as "proof" that disclosures were made is to no avail. Similarly, the bankruptcy court's finding that the Daviscourts' testimony was outweighed by other evidence does not lead this Court to a "definite and firm conviction that a mistake has been made."

■■■ Under § 523(a)(2)(A), Columbia was required to show "justifiable" reliance, which is satisfied if the falsity of the representation relied upon is not patent from "a cursory examination or investigation." [30] The bankruptcy court found that Columbia's reliance on the year-end financial statements was "justifiable," and that it did not, in fact, rely on the BBCs. However, with respect to the Julian job, the trial court found that Columbia over-advanced funds in connection with renewing and extending Northwest's LOC "in reliance" on Greg's misrepresentations.[31] Though the court did not specifically state that Columbia's reliance on Greg's re-

peated misstatements regarding the Julian job and the status of a number of other accounts receivable was justifiable, it is clear that the Bank's reliance in fact meets the standard of justifiable reliance enunciated in *Field v. Mans.* Therefore, the bankruptcy court's finding that Greg's liability for the Northwest LOC was non-dischargeable was proper under § 523(a)(2)(A).

### 2. Columbia's claim against Patricia

■■ Following the bank's presentation of evidence, the bankruptcy court granted Patricia's motion for summary judgment on the fraudulent misrepresentation claims, stating that "status of an officer and a 50–percent owner of a corporation is not a basis alone to make Mrs. Daviscourt vicariously liable for Mr. Daviscourt's liability...." [32] Columbia had argued that Greg's fraud could and should be imputed to Patricia under agency principles. The evidence showed that Patricia was not active in Northwest's operations, although she was designated its Vice President, Secretary, and Treasurer. Also, though Patricia claimed she performed no real function in the business, she was paid a $39,000 annual salary, and did, at least occasionally, sign checks drawn on Northwest's account. Moreover, as its Vice President and Secretary, Patricia signed some of the financial statements that Northwest provided to Columbia.

There appears to be no real dispute that the misrepresentations upon which Columbia relied in extending the LOC to Northwest did not come from Patricia. The

**28.** *Las Vegas Ice & Cold Storage Co. v. Far W. Bank,* 893 F.2d 1182, 1185 (10th Cir.1990).

**29.** *Id.* (citation omitted).

**30.** *Field v. Mans,* 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

**31.** *Ruling* at 10, *in* App. at 461.

**32.** *September 29, 2005, Hearing Transcript* at 13, *in* App. at 1367.

issue is whether the fraud, if any, perpetrated by Greg can be imputed to her. Columbia relies on *In re Tsurukawa*[33] for the proposition that one spouse's fraud may be imputed to the other under agency principles. In *Tsurukawa*, the "innocent" spouse owned half of a partnership that was run by her husband. As in the present case, the debtor was a homemaker and mother who was, at most, passively involved in partnership business, and there was apparently no evidence that she personally misled the creditor. Nonetheless, the *Tsurukawa* court found her debt non-dischargeable under § 523(a)(2)(A), holding that a partner's wrongdoing, occurring in the ordinary course of the partnership business, is imputed to an innocent partner for non-dischargeability purposes.[34]

The Debtors respond to *Tsurukawa* by pointing out that it involved a partnership, rather than a corporation. Our Circuit has not addressed this issue, which leaves it to this Court to decide whether the bankruptcy court erred in refusing to impose liability on Patricia for Greg's fraud. In addition to the distinction between a partnership and a corporation, which we deem significant, there is insufficient evidence in the record to find that Patricia intended that Greg act as her "agent." Columbia contends that such an agency arises out of Patricia's "abandonment of her post" at Northwest. However, Columbia fails to cite any relevant authority for the proposition that a corporate shareholder and director must either oversee every aspect of the company's business or face imputed liability for the actions of other officers, and we decline to so hold. Accordingly, that portion of the bankruptcy court's ruling that Patricia, having made none of the misstatements upon which Columbia relied, is not liable under § 523(a)(2) for Greg's misstatements is affirmed.

## C. Willful and Malicious Injury Claim

■ Columbia's § 523(a)(6) claim is based on the Debtors' diversion of more than $200,000 in accounts receivable proceeds to an account newly set up for that purpose. Significantly, unlike the § 523(a)(2) claim, this claim does involve Patricia's personal participation. Patricia opened the Norcon account as its Vice President. Though Patricia testified that she was unaware that the new account would be used to divert proceeds from the lockbox, the bankruptcy court found this testimony not credible, particularly since she attended a meeting, two days after opening the account, at which she and her husband promised that all accounts receivable proceeds would be deposited in a lockbox. Moreover, Patricia accepted payment of her Northwest "salary" by a check drawn on the Norcon account.

Section 523(a)(6) requires "willful and malicious injury by the debtor," which we have interpreted to mean that "the debtor must intend that conversion of the collateral injure the creditor or the creditor's lien interest."[35] The Debtors claim that Greg's "good intentions" defeat a finding of the intent required under § 523(a)(6). However, the bankruptcy court disagreed, finding that, at best, "debtors, knowing that what they were doing constituted a wrongful taking of the Bank's collateral proceeds, proceeded to do so with some hope that this might mitigate the Bank's loss."[36]

---

33. 287 B.R. 515 (9th Cir. BAP 2002).

34. *Id.* at 525–26.

35. *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir.BAP1999).

36. *Ruling* at 13, *in* App. at 464.

The adequacy of the Debtors' intent requires consideration of *Longley,* which involved a debtor's transfer of an automobile to a drug dealer under threat of immediate bodily harm, and *Bombardier Capital, Inc. v. Tinkler (In re Tinkler),*[37] which involved a debtor's sale of collateral "out of trust" that was motivated by a desire to keep his business in operation. In both cases, which we find instructive, the debtors' conduct was found insufficient to satisfy the intent requirement of § 523(a)(6). However, as noted by the bankruptcy court, the *Tinkler* court specifically declined to hold that a motivation to sustain the debtor's business necessarily precludes a finding that a conversion was "willful and malicious."[38] The court found that Columbia was injured by the Daviscourts' conversion of proceeds because those funds were not then available to the bank. The Debtors' hope that Northwest could thereby be kept afloat was insufficient to render their intent less than "willful and malicious." We agree.

## V. CONCLUSION

We affirm the bankruptcy court's decision that Debtor Greg Daviscourt's debt on the Northwest LOC is non-dischargeable, pursuant to 11 U.S.C. § 523(a)(2)(A). We likewise affirm the bankruptcy court's determination of non-dischargeability of the converted funds, as against both Debtors, pursuant to 11 U.S.C. § 523(a)(6). Finally, we affirm the bankruptcy court's decision discharging the LOC debt against Debtor Patricia Daviscourt on the grounds that she did not make the false representations upon which the Bank justifiably relied, pursuant to 11 U.S.C. § 523(a)(2)(A).

---

**37.** 311 B.R. 869 (Bankr.D.Colo.2004). | **38.** *Id.* at 883.