**In re Alan Denoil JOHNSON and Shelley Coon Johnson,**
**Debtor.**

**DSC National Properties, LLC,**
**Plaintiff–Appellee,**

v.

**Alan Denoil Johnson, Defendant–Appellant,**

and

**Shelley Coon Johnson, Defendant.**

BAP No. UT–11–105.
Bankruptcy No. 08–28292.
Adversary No. 09–02214.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Aug. 15, 2012.

Joe Cartwright of Cartwright Law Firm, P.C., Salt Lake City, Utah, for Defendant–Appellant.

Joseph M.R. Covey (Miriah R. Elliott with him on the brief) of Parr Brown Gee & Loveless, Salt Lake City, Utah, for Plaintiff–Appellee.

Before BROWN, RASURE, and SOMERS, Bankruptcy Judges.

## OPINION

RASURE, Bankruptcy Judge.

Appellant/Debtor Alan Denoil Johnson ("Johnson") appeals the Final Judgment and Order ("Judgment") excepting from discharge, under 11 U.S.C. § 523(a)(2)(A),[1] the debt owed to Appellee/Creditor DSC National Properties, LLC ("DSC"). Because we conclude that the bankruptcy court erred in determining that Johnson intended to deceive DSC, we REVERSE.

## I. BACKGROUND[2]

Johnson had been in the farming and ranching business in Utah since graduating from high school. He took over his father's farm in the 1980s and began raising cattle. In the 1990s, Johnson sold some of the family farmland in Tooele County, Utah, to a developer, reinvesting the funds in his expanding ranching opera-

tion. When the developer ceased doing business in Utah, Johnson formed a company, South Willows Ranches, LLC ("South Willows"), of which he was sole owner, to sell the remaining lots in the development. In connection therewith, South Willows borrowed money to finance completion of certain improvements needed in order to sell the remaining lots.

In September 2007, South Willows sought to borrow a substantial sum in order to pave roads before winter set in.[3] A lender that had previously extended credit to South Willows and Johnson, Harbor Real Estate Fund, LP ("Harbor"), was not able to accommodate the financing request at that time. However, Harbor contacted the principals of DSC, Michael Bennett and Sean Clark, and referred them to Johnson.[4]

On or about October 1, 2007, Mr. Bennett called Johnson and learned that South Willows and Johnson were seeking a short-term loan in the amount of $250,000 to $300,000, and that they offered to secure the same with junior liens on six of twenty-five lots that were under a contract for sale to a developer, SLF Housing, for $100,000 per lot. Johnson intended to repay the loan with proceeds from the sale of the lots.[5] Unwilling to rely

---

1. Unless otherwise stated, all statutory references in the text refer to the Bankruptcy Code, Title 11 of the United States Code.

2. The factual matters set forth herein are taken from the bankruptcy court's Findings of Fact and Conclusions of Law ("FFCL") set forth in the Supplemental Appendix of Appellee ("Appellee's App.") at 4–13, and from uncontested or unrebutted testimony and documents presented at trial. Matters in which testimony conflicted are noted. Because Johnson contends the bankruptcy court erred because DSC presented insufficient evidence to justify a finding of intent to deceive, we

have carefully reviewed the entire record to determine whether the evidence supports an inference that it was more likely than not that Johnson intended to deceive DSC.

3. Trial Transcript ("Tr.") at 48–49, in Appellant's Appendix ("App.") at 115–16; Tr. at 181–82, in App. at 248–49.

4. FFCL at 2–3, ¶¶ 1–3, in Appellee's App. at 5–6.

5. Tr. at 58–59, 161–63, in App. at 125–26, 228–30. Each lot was encumbered by a first mortgage in the amount of $30,000, so John-

solely upon these junior liens, Mr. Bennett advised Johnson that DSC would require additional collateral.[6] In response, Johnson offered twelve shares of Grantsville Irrigation Company stock (the "Stock") and certain water rights,[7] both of which were owned by Johnson personally.

In order to determine what water rights he had available to offer as collateral, Johnson contacted the branch manager of Security Title Company, Marta Johnson (no relation to Appellant Johnson). Ms. Johnson had closed approximately 300 to 350 transactions involving water rights, including several transactions involving water rights owned by Johnson.[8] As was her custom at the time, Ms. Johnson accessed the website of the State of Utah Division of Water Rights ("State DWR").[9] With Johnson in her office, Marta Johnson pulled up an online report that indicated that Johnson owned 10.4 acre-feet of Water Right 15–408 (the "Water Right").[10] Based upon the State DWR report accessed by Marta Johnson, Johnson offered those 10.4 acre-feet as additional collateral to DSC.[11]

Mr. Bennett testified that Johnson stated that he needed the loan "in two to three days,"[12] and Johnson stipulated to that effect in the Pretrial Order.[13] At trial, however, Johnson testified that he did not actually need the funds until after the road paving was completed, but he did need a commitment for financing to show the contractor prior to work beginning in order to get a discount,[14] and that he must have misread or overlooked the "two or three days" language in the Pretrial Order.[15] The bankruptcy court found Mr. Bennett more credible on that account, however, and since that finding is supported by some evidence, it is not clearly erroneous. Accordingly, we assume as fact that Johnson conveyed a sense of urgency in obtaining and closing the loan.

Mr. Bennett spent the next two days inquiring into Johnson's creditworthiness, and attempting to determine title to and value of the collateral. Mr. Bennett obtained a title report and title insurance on the six undeveloped lots. Marta Johnson provided DSC with a copy of the State DWR online report that reflected that Johnson owned 10.4 acre-feet of the Water Right. At trial, Marta Johnson brought her file regarding the transaction, which contained a print-out of such a report dated 9/7/2007, which was introduced into evidence.[16] On the top of the 9/7/2007 report

---

son believed that each lot would yield $70,000 in equity. Tr. at 179, *in* App. at 246.

6. Tr. at 49–50, *in* App. at 116–17.

7. FFCL at 2–3, ¶ 3, *in* Appellee's App. at 5–6. In Utah, a water right is "the right to use water diverted at a specific location on a water source, and putting it to recognized beneficial uses at set locations." http://www.waterrights.utah.gov/wrinfo/glossary.asp (accessed on Aug. 15, 2012). An acre-foot is a "unit commonly used to measure volume of water; equal to 43,560 cubic feet, or 325,851 gallons (will cover one acre one foot deep)." *Id.*

8. Tr. at 107–09, *in* App. at 174–76.

9. *Id. See also* Tr. at 113, *in* App. at 180.

10. Tr. at 157–58, *in* App. at 224–25. *See also* Tr. at 186, *in* App. at 253.

11. FFCL at 4, ¶ 14, *in* Appellee's App. at 7.

12. Tr. at 48–49, *ll.* 24, *in* App. at 115–16.

13. Pretrial Order at 4, *in* App. at 54.

14. Tr. at 182, 184–85, *in* App. at 249, 251–52.

15. Tr. at 171–73, 198, *in* App. at 238–40, 265.

16. It is not clear whether this particular report, dated 9/7/2007, was provided to DSC. Testimony of Marta Johnson and Johnson suggest that they accessed a report online in October 2007 during a conference call with Mr. Bennett, which may have been printed out and transmitted to Mr. Bennett. Tr. at 157–58, *in* App. at 224–25.

is a disclaimer: "Warning: Water Rights makes NO claims as to the accuracy."[17] Johnson testified that he did not see that warning when he viewed the report online with Marta Johnson.[18]

Mr. Bennett attempted to obtain title insurance for the Water Right, and discovered that only two companies in Utah insured title to water rights. Both companies advised Mr. Bennett that it would take two to three weeks to obtain a title report on the Water Right, and insurance would cost between $2,000 and $3,000.[19] Mr. Bennett testified that Johnson assured him that he did not need title insurance on the Water Right, and that title insurance did not cover much, would "waste time," and "kill the deal."[20]

Johnson denied discouraging Mr. Bennett from trying to obtain title insurance because, he testified, "I didn't even know until at that point at that closing that you could get title insurance on water. That was a new concept for me."[21] He also testified that "I have never received a water title insurance policy. I've always use[d] Bruce Findlay or other water attorneys," and "I don't know of any ... title insurance on any water rights that I've ever transacted. I know that ... there's been ... title insurance on the land. And I've always relied on attorneys and title companies to ... search out these ... ownerships."[22]

Mr. Clark testified that Johnson represented that the loan was "over-collateralized" and that Johnson was "good for it" and there was "no need, but more importantly no time, for title insurance. Which was, that was our biggest sticking point. And he ... reassured us that that was not important."[23] Johnson referred Mr. Bennett to his "water attorney," Mr. Bruce Findlay, to answer questions about his Water Right because Mr. Findlay had advised him on all his water transactions. Johnson told Mr. Findlay that he would pay any costs incurred if Mr. Bennett contacted him to verify the water rights.[24] Mr. Bennett did call Mr. Findlay, but instead of inquiring about title to the Water Right, he asked about Johnson's background and character.[25]

On October 4, 2007, Johnson, on behalf of South Willows and himself personally,[26] executed a Secured Promissory Note ("Note") in favor of DSC in the original principal amount of $197,731.96, payable no later than November 3, 2007.[27] To secure payment of the Note, South Willows and Johnson executed a deed of trust granting DSC junior liens on six of the lots then under contract for sale and 10.4 acre-feet of the Water Right.[28] Marta Johnson

---

17. Report, *in* Appellant's Supplemental Appendix ("Supp. App.") at 120–22.

18. Tr. at 186, *in* App. at 253.

19. Tr. at 50–51, *in* App. at 117–18.

20. Tr. at 52, *ll.* 6–7, *in* App. at 119; FFCL at 3, ¶ 7, *in* Appellee's App. at 6.

21. Tr. at 156, *ll.* 10–12, *in* App. at 223.

22. Tr. at 176, *ll.* 13–15, 20–25, *in* App. at 243. See also Tr. at 187, *in* App. at 254.

23. Tr. at 205, *ll.* 5–13, *in* App. at 272.

24. Tr. at 159, 197–98, *in* App. at 226, 264–65.

25. Tr. at 52, *in* App. at 119; FFCL at 3, ¶ 6, *in* Appellee's App. at 6.

26. Co-debtor Shelley Coon Johnson also signed the note and security documents at issue, but DSC did not prevail in its nondischargeability action against her.

27. Secured Promissory Note, *in* Supp. App. at 16–20; FFCL at 3, ¶ 8, *in* Appellee's App. at 6.

28. Deed of Trust and Assignment of Rents, *in* Supp. App. at 22–30; FFCL at 4, ¶¶ 12–15, *in* Appellee's App. at 7.

closed the transaction, and included the 10.4 acre-feet of the Water Right as collateral by typing it onto the deed of trust.[29] Johnson also pledged the Stock. It is undisputed that DSC relied upon the pledge of the Water Right in extending credit to South Willows and Johnson.[30]

The only documentary evidence reflecting Johnson's opposition to DSC obtaining title insurance is an email dated October 22, 2007, from Mr. Clark to Mr. Bennett in connection with a second proposed loan to Johnson by another entity (A.D.D. Investments, LLC ("ADD")). Johnson offered to pledge a different water right to secure that loan.[31] At some point, Mr. Bennett spoke to Marta Johnson about obtaining title insurance on this water right. In the email to Mr. Bennett dated October 22, 2007, Mr. Clark stated that—

> title insurance is $2200 and "doesn't cover anything" according to Marta. [Johnson] doesn't want to do that and Marta is telling him it isn't beneficial. So, we need to become collateralized another way, hopefully with the deed or the rights. . . . Title insurance might kill the deal.[32]

Mr. Clark testified that in connection with the second loan request, "once again they stated everything they had stated the first time. Which was title insurance—I actually grilled Marta the second time, because I said, Marta, you're . . . the title specialist. I'm surprised that you're tell-ing me title insurance isn't important. And she said basically what she said [in her testimony], which was in her experience she had seen that it actually didn't . . . cover anything."[33] Johnson testified that he did not intend to communicate to Mr. Clark that title insurance was not necessary, but rather that he did not want to pay $2,200 for title insurance.[34] ADD apparently made the loan, secured by this other water right, which was "a valid water right."[35]

Ultimately, the real estate market, and the national economy, crashed and SLF Housing, which had contracted to purchase the twenty-five lots for $2.5 million, was no longer able to obtain financing.[36] South Willows was unable to realize the equity that Johnson planned to use to retire various bridge loans, including the DSC loan. South Willows and Johnson defaulted on the Note, and on November 24, 2008, Johnson filed a petition for relief under Chapter 11 of the Bankruptcy Code.

After obtaining relief from the automatic stay, DSC sold the Stock for $35,000[37] and attempted to foreclose on the Water Right. In preparing for the foreclosure proceeding, DSC obtained a title report that reflected that Johnson did not own 10.4 acre-feet of the Water Right.[38]

On May 29, 2009, DSC filed an adversary complaint ("Complaint")[39] alleging that Johnson's representation that he owned 10.4 acre-feet in the Water Right

---

**29.** Tr. at 112, *in* App. at 179.

**30.** FFCL at 4, ¶ 13, *in* Appellee's App. at 7.

**31.** Tr. at 183–84, *in* App. at 250–51.

**32.** Def.'s Exh. 1, *in* Supp. App. at 116.

**33.** Tr. at 209–10, *ll.* 23–25, 1–6, *in* App. at 276–77.

**34.** Tr. at 184, *in* App. at 251.

**35.** Tr. at 191, *l.* 21, *in* App. at 258.

**36.** Tr. at 161–63, *in* App. at 228–30.

**37.** Tr. at 56, *l.* 22, *in* App. at 123.

**38.** Tr. at 55–56, *in* App. 122–23; FFCL at 4, ¶ 16, *in* Appellee's App. at 7.

**39.** Complaint to Determine Dischargeability of Debt Under 11 U.S.C. § 523(a), *in* App. at 9–46.

was false; Johnson had made the representation with the intent to deceive DSC; DSC relied upon the representation in extending credit; had DSC known the representation was false, it would not have loaned Johnson $197,731.96; and DSC was damaged by Johnson's default on the Note.[40] DSC sought damages and a declaration the debt was excepted from discharge under § 523(a)(2)(A).[41] In his defense, Johnson contended that he honestly believed that he owned 10.4 acre-feet of the Water Right when he pledged it to DSC, and therefore he lacked an intent to deceive DSC.

The matter was tried on its merits on August 29, 2011. DSC presented Ron Dean as its expert witness with respect to title to water rights. From 1978 to 2010, while employed by law firms and title insurance companies, Mr. Dean acquired significant experience in examining and insuring real property titles in Utah. In mid-2001, he participated in creating "the nation's first water rights title insurance company."[42] At the time of trial in 2011, Mr. Dean was self-employed, doing business as The Water Title Guy, LLC.[43]

In January 2009, DSC retained Mr. Dean to prepare a title report on the Water Right in anticipation of foreclosing on it. According to his report, Mr. Dean relied on the State DWR records to determine the amount of acre-feet originally granted to Johnson—"705.4 acre feet of water for the irrigation of 176 acres."[44] He then searched the land records of Tooele County, Utah, and determined that between 1998 and 2003, Johnson had transferred 708 acre-feet of the Water Right in ten separate transactions, which was 2.6 more acre-feet than Johnson owned.[45] Even though he had already conveyed all his interest in the Water Right, Johnson thereafter executed three additional deeds or assignments of 1.5, 12.5 and 10.4 acre-feet respectively, which were recorded in Tooele County in 2004 and 2005.[46]

Johnson acknowledged that Mr. Dean's title search established that he did not have any interest in the Water Right at the time he executed the trust deed pledging 10.4 acre-feet to DSC.[47] He testified, however, that he did not know or learn that he had conveyed all of his interest in the Water Right until DSC attempted to foreclose on the Water Right in January 2009. Johnson testified that he had always relied upon the State DWR's records to reflect the extent of his water rights, and upon his attorney, Mr. Findlay, and

---

**40.** In its Complaint, DSC sought recovery of the original principal amount, plus sixteen percent interest, compounded monthly, and fees, totaling in excess of $816,000, less $60,000 it had recovered from foreclosing on the other collateral. Complaint at ¶ 46, *in* App. at 15. Prior to trial, DSC agreed to reduce the interest rate to the statutory default rate of ten percent, thus reducing its demand to $244,799.17 plus attorney fees and costs. *See* Pretrial Order at 8, *in* App. at 58.

**41.** In the Complaint, DSC also claimed that the security documents constituted a writing that contained a materially false statement regarding Johnson's financial condition, rendering the debt non-dischargeable under 523(a)(2)(B). That claim was abandoned in

the Pretrial Order. *See* Pretrial Order at 13, *in* App. at 63.

**42.** Expert Report of Rodney K. Dean at 5, *in* Supp. App. at 10.

**43.** *Id.* at 4, *in* Supp. App. at 9, 14.

**44.** Title Report, *in* Supp. App. at 11–13.

**45.** FFCL at 5, ¶¶ 17–19, *in* Appellee's App. at 8.

**46.** Title Report, *in* Supp. App. at 13; FFCL at 5, ¶¶ 20–22, *in* Appellee's App. at 8.

**47.** *See* Pretrial Order at 6–7, *in* App. at 56–57.

Marta Johnson at Security Title Company, both of whom he observed accessing the State DWR website to do so.[48] Mr. Dean testified, however, that it was necessary to consult both the State DWR records and the county land records to ascertain ownership of water rights.[49] In preparing his title report, Mr. Dean discovered that some conveyances executed by Johnson that were recorded in the Tooele County land records had not been reported to the State DWR. Accordingly, the State DWR online report of Johnson's ownership was not accurate when Johnson pledged 10.4 acre-feet to DSC.

Mr. Dean testified that although transfers of water rights are perfected by recording in the county land records, all water rights transactions are supposed to be reported to and compiled by the State DWR. Unfortunately, the party responsible for reporting water rights transfers to the State DWR had not consistently done so. Mr. Dean stated that in his experience, the State DWR's records were wrong 60 to 75 percent of the time.[50] He explained the cause of the discrepancies as follows:

> [P]rior to 2000[,] it was the County Recorder's responsibility to send any deeds that they received in the County that dealt with water to the Division of Water Rights so that the [Division of] Water Rights can keep their records current.
>
> Well, that didn't happen so much, and so … in 2000 they passed some legislation so the water user, the *purchaser* of a water right, was to file with the Division of Water Rights a report of water rights conveyance.
>
> And that … was an attempt to … tell the Division of Water Rights what the title was in the County…. [T]hat's why you search both the Division of Water Rights and the County records.[51]

Mr. Dean further testified that the State DWR kept "official" records "because they have to administer the water right. So if someone's gonna file a change application, do something to move the water, they want to make sure they have the current owner." [52]

Mr. Dean was not aware of anything on the State DWR website that instructed users to investigate the status of title in the county land records, and other than the disclaimer on the online report, the records appear to make official representations as to the status of title.[53] In cross-examination, Johnson's counsel asked Mr. Dean:

Q: [I]s it fair to say that the Division of Water Rights' official records have contributed to misleading the public … as to the status of water ownership?

A: For people that rely on it, yes.

Q: And they make it very easy to look up and see [who] the owner of the water right is, don't they?

A: They have a wonderful website.

Q: [ ] Even though part of it's just wrong?

A: Yeah…. It's based on the infor-

---

48. Tr. at 151, *in* App. at 218.

49. Tr. at 88–89, *in* App. at 155–56.

50. Tr. at 90, *ll.* 11–14, *in* App. at 157.

51. Tr. at 88–89, *ll.* 15–25, 1–6, *in* App. at 155–56 (emphasis added).

52. Tr. at 102, *ll.* 15–18, *in* App. at 169. According to Mr. Dean's testimony, it appears that Johnson, as a seller of water rights, did not have a duty to report transfers to the State DWR.

53. Tr. at 103, *in* App. at 170.

mation that they have.[54]

Marta Johnson, who had provided closing services since 1990, testified that until recently, her employer, Security Title Company, relied on the State DWR online reports to determine who owned particular water rights and in preparing closing documents.[55] In 2007, Ms. Johnson was not aware that the State DWR records were not accurate. She did not advise Johnson that the online report they accessed may have been wrong or that he needed to perform a title search to confirm his ownership because, she said, "back in the day you would assume ... that everything in there is ... correct. Never had any problems."[56] On cross-examination, Marta Johnson further testified as follows:

Q: (by DSC's counsel): When you provided that [State DWR] report to Mr. Johnson[,] were you representing to him that he owned 10.4 acre-feet in that water right?

A: Back then, yes[.]

Q: You were making that representation to Mr. Johnson?

A: Well, I don't know whether I'd represent it, but that's what the State does. I mean that's what the State said.

Q: And what were you conveying when you provided that report to Mr. Johnson? Were you saying, I, Marta Johnson, believe you have 10.4 acre-feet in this property?

A: Per the State, yes.

. . . .

Q: [W]hen you provided a copy of the water report from the Division of Water Rights to the lender, were you, Marta Johnson, representing to the lender that Mr. Johnson owned 10.4 acre-feet in this water right?

A: Per the records that I had from the State, that's what it said, yes.

Q: Okay. Now, you're aware that the Utah Division of Water Rights is not the official record keeper for water rights in ... Utah; is that true?

A: Yeah.... That's come out recently. That wasn't the—back in 19—or 2007.... They have changed it some. But that's where ... you went to get your information .... at the State.... At the Water Rights Department.

Q: In 2007 it was your understanding that the Utah Division of Water Rights was the official record keeper of water rights and conveyances for the State of Utah?

A: Well, they're at the County records when you do like deeds of trust, and water deeds, and that type of thing. So there's two places.

Q: Did you understand that ... the Country Recorder's office is the official recorder of ... that type of information for water rights?

A: No. Not at that time.

Q: You didn't understand that in 2007?

A: No. [Y]ou recorded it at the County. And ... the County was supposed to take and give everything to the State. And we're talking from, you know, 1990. That's how we handled the water rights.[57]

When Johnson first began conveying water rights, information was not available online, so he would—

just go in and meet with the Water Resources Board in Salt Lake at the

---

54. Tr. at 103–04, *ll.* 15–25, 1, *in* App. at 170–71.

55. Tr. at 108–09, 117–22 *in* App. at 175–76, 184–89.

56. Tr. at 109, *ll.* 16–18, *in* App. at 176.

57. Tr. at 117–21, *in* App. at 184–88.

Natural Resources Building ... and they'd print us out and tell us what we had. And then obviously it became the title company could pull it up on the computer. And now I guess everybody can pull up on the computer. I've always relied on the title company or the attorneys, again. So they determined what we had.

Q: Did anyone ever tell you to look at County Recorder's documents to identify the amount of water that you owned?

A: No, I've always relied on the ... State of Utah Water Resources.

Q: [U]p until this DSC transaction what was your understanding of the law regarding the transfer of water rights and when that transfer becomes effective?

A:[J]ust as Mr. Dean talked about this morning, that you would—it would be recorded with the County. And then the County would send it to the State Water Resources for, for their recording. And, and once it was recorded at the State, then ... the water was transferred. That was how my father taught me ... many years ago and that's the way I've always dealt with water rights, is through the State engineer.

Q: All right. And you've since learned that the State records don't reflect true ownership, right?

A: I have since learned that through ... preparing for this case. And I've learned today that the law was changed. Mr. Dean brought that to my attention.

. . . .

Q: Now speaking generally again ... would you go and check the records yourself on the computer?

A: No. I've always had—most of the time ... Marta Johnson ... would look them up on her computer. I'm not real-ly much on operating computers. But she ... would look it up for me ... and that's what she did in the case with DSC.[58]

DSC's counsel pursued a line of questioning to suggest how Johnson should have known that he did not own 10.4 acre-feet in the Water Right, and how he should have known that the State DWR's record of his ownership in the Water Right was inaccurate, as follows:

Q: You understand—stood that—didn't you, that you began with 705 acre-feet of water in Water Right 15–408?

A: Originally, yes[.]

Q: You also understood that each time you conveyed an interest in the water right you knew how much you were conveying, correct?

A: Well, like my wife, I didn't look at it that closely because I was dealing with developers and other people that—and attorneys were supposed to be covering me, so I relied on them.

Q: Do you keep—

A: But ... I didn't ever keep a ledger or anything like that.

Q: [Y]ou don't keep any record?

A: I didn't keep a ledger, I relied on my attorney to do that.

Q: Would you agree that tracking the amount of acre-feet in which you retained an interest in this water right was simply a matter of mathematics? Started with how much water you started, and then subtracted from that ... transfers you made?

A: I didn't keep a ledger. I relied on the State record, as well as my attorney.

Q: Did you keep a ledger or a record of any transfers you made?

58. Tr. at 152–54, *in* App. at 219–21.

A: No. I just kept the copies of the . . . deeds and so forth that came from the title company. . . . The attorneys kept those records.

Q: But you did keep copies of the deeds themselves?

A: Well, they were in the closing packages. But . . . most of the time [the water rights] were transferred with a real estate transaction. . . . [L]ike I said, Marta kept most of them, and the attorneys kept them.[59]

Johnson also testified that he signed whatever was put in front of him by the professionals to consummate an intended transaction. Because he had several different water rights, and the State subdivided and reassigned numbers to portions of his water rights, he relied on the State and professionals to keep track of what particular water right was associated with land he was conveying, and how much water he retained.[60] Johnson did not know that the State DWR's records were incomplete. Reliance on the State DWR's records resulted in Johnson conveying more acre-feet than he owned in this Water Right on three occasions prior to the pledge to DSC. Those three transactions were prepared and/or reviewed by Johnson's attorney and the title company, both of whom had consulted the State DWR records to determine Johnson's ownership.[61]

The record does not contain any evidence suggesting that Johnson prepared any of the documentation for any of the water transactions,[62] that he knew how to research the extent of his title, that he knew that the State DWR's online reports were inaccurate, or that he knew that the Tooele County recording office and/or water purchasers had not faithfully supplied information concerning his water conveyances to the State DWR.

It was also undisputed that Johnson owned other assets, as reflected in the financial statement that his accountant provided to DSC, so that, had he known or suspected that he did not own 10.4 acre-feet in the Water Right, he could have offered another asset as additional collateral.[63]

In a bench ruling at the conclusion of the trial, the bankruptcy court found and concluded that DSC established all the elements required to except a debt from discharge under § 523(a)(2)(A), and entered judgment in favor of DSC.[64] With respect to the element of intent to deceive, the bankruptcy court found that Johnson acted recklessly in relying on the State

---

59. Tr. at 188–89, *in* App. at 255–56; FFCL at 5, ¶ 19, *in* Appellee's App. at 8 ("Johnson did not keep track of these transfers over the years.").

60. Tr. at 190–92, 194, *in* App. at 257–59, 261.

61. Tr. at 192–93, *in* App. at 259–60. *See also* Tr. at 196–97, *ll.* 19–25, 1–6, *in* App. at 263–64 (Johnson personally observed Mr. Findlay confirming his interest in water rights by accessing the State DWR website).

62. Tr. at 151–52, *ll.* 24–25, 1–2, *in* App. at 218–19 (documents were always prepared by "water attorneys," "real estate attorneys," a title company, or Marta Johnson).

63. FFCL at 3, ¶ 4, *in* Appellee's App. at 6; Statement of Financial Condition, *in* Supp. App. at 49–53; Tr. at 152, 160–61, 191, *in* App. at 219, 227–28, 258. Johnson testified that he owned, among other things, other water rights, cattle, ranch land, equipment, and a home he inherited from his parents that he could have offered as collateral had he known the State DWR records were wrong and he did not own the 10.4 acre-feet. To secure the ADD loan made later in October 2007, Johnson pledged a different water right to another lender, which he did in fact own.

64. Written findings of fact and conclusions of law were filed on October 4, 2011. FFCL, *in* Appellee's App. at 4–13.

DWR report and failing to independently verify his ownership from his own records, the totality of which, the court concluded, satisfied the intent element. The Judgment was entered on November 2, 2011, in the amount of $244,799.28 plus attorney fees and costs of $72,320.28.[65] Johnson filed his Notice of Appeal on November 14, 2011. The sole issue on appeal is whether the bankruptcy court correctly found that Johnson intended to deceive DSC.

## II. APPELLATE JURISDICTION

We have jurisdiction over this appeal because the Judgment is a final order that ended the parties' dispute on the merits, leaving nothing further for the bankruptcy court to do but execute the judgment.[66] Johnson's notice of appeal was timely filed.[67] Neither party elected to have the appeal heard by the Utah District Court, and thus they have consented to jurisdiction of this Court.[68]

## III. STANDARD OF REVIEW

 The bankruptcy court's factual findings of fact, including findings regarding intent, are reviewed for "clear error." Under the "clearly erroneous" standard,

this Court must defer to facts found by the bankruptcy court unless "it is without factual support in the record" or, after examining all the evidence, we are left with a "definite and firm conviction that a mistake has been made."[69] However, "'[w]hen a lower court's factual findings are premised on improper legal standards or on proper ones improperly applied, they are not entitled to the protection of the clearly erroneous standard, but are subject to *de novo* review.'"[70] "Whether the bankruptcy court applied the correct legal standard under § 523(a)(2)(A) is subject to *de novo* review."[71]

## IV. DISCUSSION

### A. Applicable law

 We start our analysis with the recognition that exceptions to discharge are "narrowly construed, and because of the fresh start objectives of bankruptcy, doubt [as to the meaning and breadth of a statutory exception] is to be resolved in the debtor's favor."[72] Section 523(a)(2)(A) provides that a debtor is not discharged from any debt "for money ... to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other

---

**65.** Judgment, *in* App. at 343–45.

**66.** *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).

**67.** *See* Fed. R. Bankr.P. 8002.

**68.** *See* 28 U.S.C. § 158(c)(1); Fed. R. Bankr.P. 8001(e); 10th Cir. BAP LR 8001–3.

**69.** *Cobra Well Testers, LLC v. Carlson (In re Carlson)*, No. 06–8158, 2008 WL 8677441 at *2 (10th Cir. Jan. 23, 2008), quoting *Las Vegas Ice & Cold Storage Co. v. Far W. Bank*, 893 F.2d 1182, 1185 (10th Cir.1990). *See also First Nat'l Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 673 (10th Cir. BAP 2005), *aff'd*, No. 05–6225, 2006 WL 1875366 (10th Cir. July 7, 2006).

**70.** *Sender v. Johnson (In re Hedged–Invs. Assocs., Inc.)*, 84 F.3d 1267, 1268 (10th Cir. 1996) (quoting *Osborn v. Durant Bank & Trust Co. (In re Osborn)*, 24 F.3d 1199, 1203 (10th Cir.1994)).

**71.** *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 783 (10th Cir. BAP 1998).

**72.** *Carlson*, 2008 WL 8677441, at *2, quoting *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir.1997). *See also Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir.1997) (citation omitted) (reasons for excepting debt from discharge must be "real and substantial, not merely technical and conjectural"); *Kukuk*, 225 B.R. at 782 (and cases cited therein).

than a statement respecting the debtor's or an insider's financial condition[.]" [73] A creditor seeking to except its debt from a debtor's discharge under § 523(a)(2)(A) must prove, by a preponderance of the evidence [74]—

(1) the debtor made a false representation;

(2) the debtor made the representation with the intent to deceive the creditor;

(3) the creditor relied on the representation;

(4) the creditor's reliance was justifiable; and

(5) the debtor's representation caused the creditor to sustain a loss. [75]

In the Tenth Circuit, this statute has been narrowly construed to limit the harsh result of non-dischargeability to "frauds involving moral turpitude or intentional wrong." [76] "[F]raud implied in law which may arise in the absence of bad faith or immorality" is not sufficient. [77] The debtor must have acted with the *subjective intent* to deceive the creditor. [78]

■■■ A subjective intent to deceive may be inferred from the totality of the circumstances. [79] Making a representation to a creditor with a "reckless disregard for the truth" may be some evidence of an intent to deceive the creditor. [80] However, a finding of "reckless disregard for the truth" translates into subjective intent to deceive (*i.e.*, scienter) only in very narrow circumstances. [81]

■■■ In determining dischargeability, we assess scienter—and the concept of "reckless disregard for the truth" as circumstantial evidence of scienter—under "the general common law of torts as understood in 1978 when § 523(a)(2)(A) was enacted," [82] rather than under any specific state's law. The United States Supreme Court consults the Restatement (Second) of Torts (hereinafter, the "Restatement") as an authority for the general understanding of the common law tort of fraudulent misrepresentation. [83]

Under the topic of "Fraudulent Misrepresentation (Deceit)," § 526 of the Restatement defines "Conditions Under Which Misrepresentation Is Fraudulent (Scienter)." [84] Section 526 states—

---

**73.** 11 U.S.C. § 523(a)(2)(A).

**74.** *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (preponderance of evidence standard).

**75.** *See Johnson v. Riebesell*, 586 F.3d 782, 789 and n. 3 (10th Cir.2009).

**76.** *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir.1986) (abrogated on other grounds by *Grogan*, 498 U.S. 279, 111 S.Ct. 654); *Kukuk*, 225 B.R. at 787. *See also In re Acosta*, 406 F.3d 367, 372 (5th Cir.2005).

**77.** *Kukuk*, 225 B.R. at 787 (quoting *Black*, 787 F.2d at 505).

**78.** *First Nat'l Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 674 (10th Cir. BAP 2005), *aff'd*, No. 05–6225, 2006 WL 1875366 (10th Cir. July 7, 2006) (and cases cited therein); *Kukuk*, 225 B.R. at 786–88.

**79.** *Cribbs*, 327 B.R. at 673.

**80.** *Id.*

**81.** *Id.*; *Kukuk*, 225 B.R. at 787.

**82.** *Field v. Mans*, 516 U.S. 59, 71 n. 9, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *Kukuk*, 225 B.R. at 783. *See also Palmacci v. Umpierrez*, 121 F.3d 781, 786 n. 2 (1st Cir.1997).

**83.** *See Field*, 516 U.S. at 70–72, 116 S.Ct. 437 ("Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress" enacted § 523(a)(2)(A)).

**84.** Restatement § 526.

 A misrepresentation is fraudulent if the maker

(a) knows or believes that the matter is not as he represents it to be,

(b) does not have the confidence in the accuracy of his representation that he states or implies, or

(c) knows that he does not have the basis for his representation that he states or implies.[85]

As stated previously, the touchstone to a finding of intent to deceive is the speaker's actual subjective state of mind—*i.e.*, the speaker's actual knowledge and belief—at the time the misrepresentation is made. Subsection (a) covers the situation where the speaker *knows* that the representation he is making is false; in other words, the speaker is lying about the fact. Under subsection (b), a representation may be fraudulent if the speaker is *"conscious* that he has neither *knowledge nor belief* in the existence of the matter he chooses to assert . . . as a fact."[86] Under subsection (c), the speaker is *consciously aware* that he does not have the factual basis for the statement that he represents or implies that he has.

 Carelessness in making a statement that turns out to be untrue constitutes negligence, and a negligent misrepresentation is not necessarily fraudulent. The comments to the Restatement § 526 state that—

The fact that the misrepresentation is one that a man of ordinary care and intelligence in the maker's situation would have recognized as false is not enough to impose liability upon the mak-

er for a fraudulent misrepresentation under the rule stated in this Section, but it is evidence from which his lack of honest belief may be inferred. So, too, it is a matter to be taken into account in determining the credibility of the defendant if he testifies that he believed his representation to be true.[87]

Accordingly, the fact that a reasonable person exercising ordinary prudence *should have known* that the statement was not true does not, by itself, establish an intent to deceive.

This distinction between fraudulent and non-fraudulent misrepresentation is made in the Restatement. Under the topic of "Negligent Misrepresentation," § 552 states—

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.[88]

Thus, in certain commercial transactions, a person who makes representations in order to obtain pecuniary gain (a seller, for example) has a duty to "exercise the care or competence of a reasonable man in obtaining or communicating the information."[89] A breach of the duty of care and competence, committed in good faith but resulting in the dissemination of misinformation, may render the speaker liable to the misled party for negligent misrepre-

---

85. *Id.*

86. *Id.* cmt.e (emphasis added).

87. *Id.* cmt.d. "For the rules that determine the liability of the maker of a representation that he believes to be true, but which through

his negligence is misleading, see [Restatement] § 552." *Id.*

88. Restatement § 552(1).

89. Restatement § 552 cmt. e.

sentation. A breach of such a duty does not necessarily implicate knowledge of the falsity of the representation or an intent to deceive, however, and thus does not satisfy the scienter element of § 523(a)(2)(A).

In the Restatement, fraudulent misrepresentation is distinguished from negligent (non-fraudulent) misrepresentation by contrasting the mental states involved in a speaker's breach of the "duty of honesty" and a breach of the "duty of care." [90] "Honesty requires only that the maker of a representation speak in good faith and without consciousness of a lack of any basis for belief in the truth or accuracy of what he says." [91] The duty of care, however, is measured by an objective standard, imposing a duty of care and competence "of a reasonable man in obtaining or communicating the information" under the circumstances. [92]

Although case law in this circuit holds that intent to deceive may be inferred from a "reckless disregard for the truth," there is no consensus as to what that phrase means in the context of § 523(a)(2)(A). [93] We note that the Restatement equates a certain type of reckless behavior to scienter in its comment to § 526(b) (which describes circumstances under which a statement is fraudulent).

Section 526(b) states that a misrepresentation is fraudulent if the speaker "does not have the confidence in the accuracy of his representation that he states or implies." [94] In other words, if a speaker claims knowledge of a fact, but the speaker is aware that he really does not know whether it is true of false, he is in essence misrepresenting the state of his knowledge. [95]

Indeed, since knowledge implies a firm conviction, a misrepresentation of a fact so made as to assert that the maker knows it, is fraudulent if he is *conscious* that he has merely a belief in its existence and *recognizes* that there is a chance, more or less great, that the fact may not be as it is represented. This is often expressed by saying that fraud is proved if it is shown that a false representation has been made without belief in its truth or *recklessly, careless of whether it is true or false.* [96]

Reckless disregard for the truth, therefore, is a subjective state of mind—the speaker makes the statement without caring whether the representation is true or false—which must be distinguished from failing to exercise the care and competence of a reasonable and prudent person before representing the fact as true. A speaker who negligently makes a false

---

90. *Id.* cmt. a.

91. *Id.*

92. *Id.* cmt. e.

93. *See, e.g., First Nat'l Bank v. Cribbs (In re Cribbs),* 327 B.R. 668, 674 (10th Cir. BAP 2005), *aff'd,* No. 05–6225, 2006 WL 1875366 (10th Cir. July 7, 2006) (an inference that the debtor subjectively knew that his representation had no basis in fact may be made from a finding that the debtor recklessly disregarded evidence of the truth, but recklessness as a mental state (generally an objective inquiry) is not sufficient to establish scienter). *Accord Am. Title Ins. Co. v. Gramolino (In re Gramolino),* 183 B.R. 565, 568 (Bankr.E.D.Mo.1995) (rejecting concept that the "standard of actual

knowledge required under Section 523(a)(2)(A) has been diluted by the recognition of a standard that is based on some degree of reckless conduct").

94. Restatement § 526(b).

95. *See, e.g., Palmacci v. Umpierrez,* 121 F.3d 781, 787 (1st Cir.1997) (interpreting subsection (b) to mean that the speaker has the "intent to deceive (scienter), not so much as to the fact itself, but rather as to the extent of his information.").

96. Restatement § 526 cmt. e (emphasis added).

representation (*i.e.,* by failing to exercise reasonable care of competence in obtaining the information), but honestly believes the representation is true, is not conscious that he might be mistaken. Lacking an awareness that he is deceiving the other party, either about the fact itself or about his confidence in his knowledge of the fact, he cannot possess an intent to deceive.[97]

### B. The Bankruptcy Court's Findings Regarding Intent

In this case, on the issue of whether Johnson acted with intent to deceive, the bankruptcy court set forth the legal standard as follows:

> Intent to deceive under this Subsection 523(a)(2)(A) may be inferred from the totality ... of the circumstances and includes reckless disregard of the truth. That's the [*Daviscourt*] case ... 353 B.R. 674 Tenth Circuit BAP 2006.[98]

In its bench ruling, the bankruptcy court made the following specific factual findings regarding scienter:

Mr. Johnson essentially argues that he relied on others in making the representation regarding his ownership of 10.4 acres. Specifically he relied on his attorney, Mr. Findlay, the loan officer/title officer, Marta Johnson, and the State report.

Mr. Johnson's testimony with respect to Mr. Findlay is vague and inconclusive. Although he says he relied on Mr. Findlay repeatedly, there are no instances—testimony given with respect to instances when Mr. Findlay either prepared a type of report specifically identifying the amount of water that was owned or not owned.[99]

Based upon our review of the record, the bankruptcy court did not err in finding that Johnson did not rely on Mr. Findlay's representations or advice in ascertaining his water rights in connection with the DSC transaction. However, in determining Johnson's state of mind, whether or not Mr. Findlay ever prepared a "report" as to the extent of Johnson's water rights is beside the point.[100] Johnson testified

---

**97.** *See, e.g., In re Acosta,* 406 F.3d 367, 372 (5th Cir., 2005) ("an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive").

**98.** Tr. at 238, *in* App. at 305. *See also* FFCL at 7, ¶ 2, *in* Appellee's App. at 10.

**99.** Tr. at 238–39, *ll.* 23–25, 1–9, *in* App. at 305–06.

**100.** In its bench ruling, the bankruptcy court found not credible Johnson's testimony that he did not realize title insurance on water rights was available, noting that "[i]f nothing else, because of Mr. Findlay and his association with Mr. Findlay and presumably having obtained some type of title reports before, Mr. Johnson, the Court finds, was aware that title reports were available." Tr. at 241, *ll.* 20–24, *in* App. at 308. This finding directly conflicts with the bankruptcy court's finding, quoted above, that there was no evidence that Mr. Findlay ever prepared a report with respect to Johnson's water rights. This Court also notes the non-sequitur in the finding that Johnson's reliance on Mr. Findlay's expertise and *"presumably* having obtained some type of title reports" from Mr. Findlay compels the conclusion that Johnson was aware that *title insurance* on water was available.

After a thorough search of the record, however, we did not find any evidence from which to infer that Johnson had prior experience with water title insurance. The undisputed evidence was that the first title company to insure water rights was not founded until 2001, and by 2007, only two companies insured water rights. Tr. at 70–72, *in* App. at 138–39. Of the thirteen transactions related to the Water Right, eight were closed before the first water title insurance company was even established. Title Report, *in* Supp. App. at 11–13. Security Title Company, which provided title and closing services in connection with Johnson's transactions, did not offer title insurance on water rights.

that in the past, he personally observed his lawyer, Mr. Findlay, accessing the State DWR report online to ascertain Johnson's water rights. This unrebutted evidence provides a factual basis for Johnson's belief that the State DWR kept an accurate record of his water rights—*i.e.*, he believed his lawyer trusted them to be accurate.

■ The bankruptcy court also discounted Johnson's reliance on Marta Johnson's representation that he owned 10.4 acre-feet of the Water Right because "Johnson had a copy of the State report, which disclaims accuracy." [101] Johnson testified that he did not see the disclaimer because he read the document online in Marta Johnson's office. [102] Even if Johnson had seen the disclaimer, however, the issue is not whether a reasonable and prudent person would have relied upon Marta Johnson's representation of the extent of his water rights, or upon the State DWR report in light of the disclaimer, but whether Johnson actually knew or believed that the report was inaccurate with respect to its representation that he owned 10.4 acre-feet of the Water Right, or lacked confidence in its truth. "[A]n honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive." [103] The fact that Marta Johnson, a title company professional, believed that the State DWR maintained current and accurate records of water rights at the time the DSC transaction closed supports Johnson's belief and confidence in the accuracy of the DWR report.

The bankruptcy court further found that—

Even if Mr. Johnson did rely on these other sources, it doesn't excuse prudent behavior and doesn't condone recklessness. The evidence shows that Mr. Johnson knew the water shares he had initially. And he had records, specifically deeds, available to him to review.

As has been argued, [104] this is not a complex calculation. It's simple math. And Mr. Johnson could have taken the shares he started with, deducted those share that he had sold. But he testified he failed to keep any ledger or records.

Knowing that you are conveying an interest in property for substantial consideration and failing to keep track of those records or those transfers is reckless behavior. Most problematic though, I believe, establishes from the record that in December of 2007 Mr. Johnson conveyed the exact same amount of water rights, 10.4 acre-feet of water, less than 18 months before this transaction.

And given the fact that Mr. Johnson had conveyed substantial amounts of water, and that this exact same amount had come up less than 18 months before,

---

In any event, we do not see how a finding that Johnson was aware that water title insurance could be purchased tends to prove an intent to deceive DSC.

101. Tr. at 239, *ll.* 12–13, *in* App. at 306.

102. Tr. at 186, *ll.* 9–11, *in* App. at 253.

103. *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005).

104. DSC argued that Johnson began his reckless conduct in 2003, when he first conveyed more acre-feet than he owned, and continued

behaving recklessly in signing three more conveyances. DSC contended that "[a]t any time they could have added up the transfers to determine how many acre-feet they owned. They knew where they started. It was simple math. Subtract what you've already transferred, and they could have figured that out." Tr. at 217, *ll.* 12–16, *in* App. at 284. It is undisputed, however, that Johnson did not keep a record of his transfers, but instead asked his lawyer and the title officer what water rights he had left, and they, in turn, trusted the State DWR's records in advising him.

the Court finds it should have raised questions at a minimum. And that fact, that transfer is reflected in the Exhibit A of the expert opinion of Mr. Dean.[105]

The bankruptcy court ultimately found "that there was an affirmative representation of ownership, and that that representation was made recklessly. And, therefore, the Court finds that the requisite intent has been established."[106]

In its written Findings of Fact and Conclusions of Law, the bankruptcy court addresses its findings and conclusions regarding the intent to deceive element in a single paragraph as follows:

Johnson made the representation with the intent to deceive DSC or, under the totality of the circumstances, that intent can be inferred from [Johnson]'s reckless disregard of the truth. [Johnson] claims that he relied upon his attorney Mr. Finley [sic], the title officer Marta Johnson and the DWR Report in making his representation regarding ownership of the Water Right. [Johnson]'s reliance upon others did not excuse prudent behavior and did not condone his recklessness. [Johnson] had the ability to determine how many acre feet of the Water Right had been transferred but he failed to keep a ledger or records of

those transfers. [Johnson] was reckless when he knew that he was conveying an interest in property for substantial consideration and failed to keep track of those records or those transfers. [Johnson] was reckless when he assured Mr. Bennett that he ... owned the Water Right.[107]

The bankruptcy court's finding that Johnson acted "recklessly" in failing to be more vigilant in keeping track of his water rights by keeping a ledger and performing his own calculations as to what was conveyed rather than relying on Marta Johnson, Mr. Findlay, and the State DWR records, describes a negligent state of mind, not a reckless disregard for the truth. Importantly, the bankruptcy court did not find incredible Johnson's testimony that he believed that the State DWR's report accurately reflected his ownership interest. Instead, the bankruptcy court found that a prudent person would not have relied on the State DWR report, due to the disclaimer, and would have kept meticulous independent records of the transfers. The bankruptcy court also found that Johnson should have remembered that he previously conveyed 10.4 acre-feet of this Water Right almost two years before.[108]

---

105. Tr. at 239–40, ll. 14–25, 1–14, in App. at 306–07. Mr. Dean's report reflected a transaction involving 10.4 acre-feet of water in December 2005, not 2007, as stated by the bankruptcy court. That transaction was more than 21 months prior to the DSC transaction, not less than 18 months. Title Report, in Supp. App. at 13.

106. Tr. at 242, ll. 8–12, in App. at 309.

107. FFCL at 8, ¶ 6, in Appellee's App. at 11.

108. DSC did not raise the assignment of 10.4 acre-feet in December 2005 as evidence of Johnson's knowledge or state of mind in the Pretrial Order, through testimony, or in closing argument, and therefore the details of the transaction were not developed by either par-

ty. However, this Court notes that Mr. Dean's records reflect that the December 2005 conveyance was to Harbor Real Asset Fund, L.P., Title Report, in Supp. App. at 13, and that Mr. Johnson testified that he had previously *pledged* water rights to Harbor as security for a loan, and that the loan had been repaid; thus, it is possible to infer that Johnson believed that Harbor's lien on 10.4 acre-feet had been released upon repayment. Tr. at 180–81, in App. at 247–48. Whether the December 2005 assignment to Harbor relied upon by the bankruptcy court to infer an intent to deceive DSC is the same transaction as the collateral assignment to Harbor that Johnson mentioned in his testimony cannot be determined by the record because Johnson did not have an opportunity to address the

Failure to exercise due care that a reasonable or prudent person would have exercised in minding one's business affairs may be "reckless" in the ordinary sense of the word, but it is not "reckless disregard of the truth or falsity" of a representation as that concept relates to scienter. Under the Restatement, a person makes a misrepresentation recklessly if he "is *conscious* that he has merely a belief in its existence and *recognizes* that there is a chance, more or less great, that the fact may not be as it is represented." [109] Significantly, the bankruptcy court did not find that Johnson actually doubted the truth of his representation when he made it, just that a prudent person would have kept better records.

## V. CONCLUSION

 In order to find scienter, DSC had the burden of establishing by a preponderance of the evidence that Johnson represented that he owned 10.4 acre-feet of the Water Right (1) *knowing* he did not own it, or (2) *knowing* that his claim to ownership may or may not be true, or (3) *knowing* that he lacked a factual basis for the representation. The bankruptcy court found that a prudent person exercising reasonable diligence *should have known* that Johnson did not own 10.4 acre-feet of the Water Right and Johnson failed to exercise such care and diligence. The bankruptcy court found a breach of the duty of care and competence in representing ownership, *i.e.,* negligence, but not a breach of the duty of honesty. "Honesty requires only that the maker of a representation speak in good faith and without conscious-

ness of a lack of any basis for belief in the truth or accuracy of what he says." [110] The bankruptcy court found negligence, not scienter.

In addition, after a careful and thorough review of the record, we have a definite and firm conviction that the record contains insufficient evidence to infer from the totality of the circumstances that Johnson was aware that his representation of ownership of 10.4 acre-feet of the Water Right was or might have been wrong. Johnson had observed his professionals, Mr. Findlay and Marta Johnson, relying on the State DWR online records. Marta Johnson herself was unaware that the State DWR records were incomplete and did not accurately report ownership. Before the State DWR had online records, Johnson personally visited the State DWR office to determine his water rights. Johnson was candid with Mr. Bennett and Mr. Clark concerning the basis for his belief in owning the Water Right. Johnson had other collateral he could have and would have pledged to secure the Note had he known the State DWR record was wrong, as proven by his later pledge of a water right to ADD, through Mr. Bennett and Mr. Clark, that he did in fact own.

 Determining when a state of mind crosses from negligence to reckless disregard for the truth actionable as fraud is admittedly a very fine line. When we reverse based on the application of the wrong legal standard, we might ordinarily remand to permit the trial judge to assess whether the evidence met the reckless disregard standard as defined herein, giving

nature of the December 2005 transaction at trial. We do not believe there is evidence sufficient to support an inference that Johnson was consciously aware at the time of the DSC transaction that he absolutely transferred the last 10.4 acre-feet of the Water Right in 2005.

109. Restatement § 526 cmt. e (emphasis added).

110. Restatement § 552 cmt. a.

due regard to the court's opportunity to assess the credibility of the witnesses.[111] In this case, however, all three members of this panel have a definite and firm conviction that the record contains insufficient evidence to support a finding that Johnson acted with a subjective intent to deceive. Even though there is some evidence in the record that might be cited, on remand, to support a finding of subjective intent, we are firmly convinced that the clear weight of the evidence points to simple negligence. Because the Supreme Court has recognized that this firm conviction alone may serve as a basis for overturning a trial court's findings of fact, we believe, based on a full and careful review of the entire record, that it would be a mistake to find that Johnson acted with intent to deceive.[112]

For all of the reasons previously expressed, we conclude that the record establishes that Johnson lacked an awareness that he was deceiving DSC, either about the fact of his ownership or about his confidence in his belief, and therefore did not possess an intent to deceive DSC. Accordingly, we REVERSE, REMAND, and direct the bankruptcy court to enter judgment in favor of Johnson.

---

111. *See* Fed. R. Bankr.P. 8013.

112. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the evidence is left with the definite and firm conviction that a mistake has been committed." *Chavez v. City of Arvada,* 88 F.3d 861, 865 (10th Cir.1996) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). *See* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Civil* § 2585 n.

24 (3d ed. 2008) (collected cases). "[T]he [usual] deference mandated by Rule 52(a) has its limits." *Irving v. United States,* 49 F.3d 830, 835 (1st Cir.1995). "[I]f the [reviewing] [c]ourt is of the strong impression that the findings are against the truth and right of the case so that an injustice has been wrought, [it] is not bound and the vulnerable findings may, and should, be, cast aside." *Tittle v. Aldacosta,* 544 F.2d 752, 754 (5th Cir.1977).